**TEXACO REFINING & MARKETING, INC., and Texaco Marine Services, Inc., Appellants,**

v.

**ESTATE OF Dau Van TRAN, Vi Thi Pham, Do Van Tran, Farmer Boy's Catfish Kitchens International, Inc., Theresa Nguyen and Anh Nguyen, Appellees.**

No. 09–89–009–CV.

Court of Appeals of Texas, Beaumont.

Aug. 31, 1989.

Rehearing Denied Sept. 27, 1989.

Michael C. Farrow, Houston, for appellants.

Jon B. Burmeister, Steven C. Barkley, Louis H. Beard, Beaumont, for appellees.

## OPINION

BROOKSHIRE, Justice.

Originally, the Appellees, Vi Thi Pham and Do Van Tran, brought this cause of action based, primarily, on negligence and gross neglect, to recover their damages and injuries arising out of the death of Dau Van Tran. Dau was their son. He died on September 16, 1985. The pleadings alleged that Dau was crushed to his death between a shrimp boat and a dock or dock barge.

The litigation was initiated against the Texaco Refining & Marketing, Inc. (TRMI) and Texaco Marine Services, Inc. (TMSI). TRMI and TMSI were said to be the owners and operators of a certain seagoing vessel named TEXACO CALIFORNIA. Farmer Boy's Catfish Kitchens Internation-

al, Inc. (Farmer Boy's) was a party-defendant, being the alleged owner of the dock at which the fishing trawler was tied up.

TRMI and TMSI filed a third-party action against Theresa Thi Nguyen and Anh Nguyen, the owners of the trawler, MISS MARY, on the theories of contribution and indemnity and maintaining that the Nguyens were directly responsible to Pham and Tran. A trial followed without the intervention of a jury. There were numerous Findings of Fact and separate Conclusions of Law. Judgment was cast against TRMI and TMSI, including some limited, prejudgment interest and post-judgment interest. No punitive damages were awarded. TRMI and TMSI failed in their action over and against Farmer Boy's. Several post-judgment motions were filed. TRMI and TMSI did not prevail in any of these motions. This appeal timely followed.

█ In a well-briefed and scholarly-presented point of error, the Appellants charge that there is no evidence to support the finding of the Bench and the judgment thereon relative to the Appellants' negligence and its proximate causation of any damages. Their argument is that any conceivable liability (either negligence or proximate causation) is based solely on the opinion testimony of experts proffered by the plaintiffs below (Pham and Tran). The Appellants state that the testimony of these experts relies upon hearsay with absolutely no independent evidence of numerous, vital facts. Texas Rules of Civil Evidence, it was acknowledged, had become fully effective on September 1, 1983. *TEX.R.CIV. EVID. 701*, to and including *705*, delineated a significant departure from the previous rules of the admissibility of evidence and of the opinion testimony of experts.

*TEX.R.CIV.EVID. 702* permits scientific, technical or other specialized knowledge which will assist the trier of fact to understand the evidence or to resolve a fact that is in issue. Then, a witness, who is qualified as an expert by either knowledge, skill or experience, may testify thereto "in the form of an opinion or otherwise". Independent of *Rule 702* is *Rule 703*, authorizing an expert to base his opinion on facts or data made known to that expert at the trial or before the trial. The expert may base an opinion, or an inference, on facts or data perceived by the expert or made known to him. Significantly, if the facts or data are of a type that are reasonably relied upon by the experts in the particular field involved in forming their expert opinions or inferences upon the particular subject matters; then the facts or data, themselves, need not be admissible.

*TEX.R.CIV.EVID. 704* was certainly a significant, if not a revolutionary, change. *Rule 704* dramatically stated:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

And, of course, *TEX.R.CIV.EVID. 705* has importance here in that it permits an expert to testify as to his opinions, as to his inferences, and give his reasons therefor without a prior disclosure of the underlying facts or data, subject to the trial bench's discretionary rulings.

The father and mother of Dau Van Tran maintain that a large wave, of considerable force and height, was caused by the passage of the tanker, TEXACO CALIFORNIA. They pleaded that the speed of the TEXACO CALIFORNIA was excessive and the excessive speed caused the wave and proximately caused the death of Dau Van Tran, their oldest son.

There was a witness fairly near the scene of the tragedy at the time, one William Cooner. Cooner testified that he saw a large wave come up on the shore. The wave washed 120 to 130 feet inland. He further stated that he did not see any vessel, however, which might have caused that wave. Mr. Cooner stated that the wave he testified about was the largest surge, or largest wave, he had ever witnessed. He further swore that not seeing a vessel was not unusual because, by the time the wave, wake or surge gets to the dock or the shore, the distance traveled by the large wave is so great that the vessel causing the same would be down past a certain public park and could not be seen that far off.

Extensive pretrial discovery was developed. Each side, in the discovery process, exhibited thoroughness, diligence and detailed attention to the fact issues to be tried. To one set of interrogatories, the Appellants answered that, on or about September 16, 1985, the vessel, TEXACO CALIFORNIA, did pass the Fisherman's Reef barge dock, located in Sabine Pass, in Jefferson County. This dock was owned or leased by Farmer Boy's. This was an answer made by Texaco Refining and Marketing, Inc., the owner at the time in question of the seagoing tanker. These answers were sworn to by the affiant who made oath that he had personal knowledge of these facts. His sworn affidavit was dated October 27th, 1987. It is correct that, later, this answer was changed. It is interesting to note that the very question was asked in previous federal court interrogatories. It was previously answered "Yes". The litigation had been originally filed in the United States District Court. Apparently, the Defendants/Appellees impleaded a third-party defendant, which was a Texas corporation.

The decedent's probate estate was open and pending in the Jefferson County Probate Court and, in view of the nature of the parties' citizenships, the federal court case was non-suited and the case refiled in the state court.

Certain responses made to the interrogatories stated that TRMI admitted that the TEXACO CALIFORNIA made speed of about 8.8 knots from buoy 47 to buoy 40, then approximately 11.3 knots from buoy 40 to buoy 38 and, later, 9.7 knots from buoy 38 to buoy 32. Mr. Owens, a maritime expert, testified that he confirmed these various speeds by checking the distances and the times involved. Owens stated the speeds were also documented in the Deck Log and Bell Sheets of the vessel. Owens also further swore that the average transit speed of the tanker was 9½ knots. It is sufficient to state that the experts put on the stand by the Plaintiffs/Appellees swore that the seagoing tanker was not practicing good seamanship. One expert characterized these speeds as "barreling down". The expert further testified that the TEXACO CALIFORNIA was negligent in its speed and its seamanship; that is, the good seamanship that she, the vessel, failed to employ. We find, in the record:

"Q  In other words, it was negligent in several different areas?

"A  Yes, I do. Certainly Scott and the Skipper should have been able to appraise this ' area. They have been through there enough. That's a total disregard for the rights of others moored along in there.

"Q  As a matter of fact, I was going to ask you if you had an opinion as to whether or not their conduct on this particular occasion constituted gross negligence if we assume that gross negligence is the entire want of care which would raise the belief that the acts or omissions complained of was the result of a conscience indifference to the rights or welfare of the person or persons to be affected by it?

"A  Yeah. I figure that's gross negligent [sic] on their part, yes, I do.

Mr. Cooner was looking in the correct direction when he saw a large wave come upon the beach and roll back upon and beyond the shoreline to a depth of about 120 feet to 140 feet. This large wave, or surge, occurred sometime around 2:00 or 2:30 P.M. On September 16, 1985, the TEXACO CALIFORNIA took her pilot aboard at 1304. Her last line was off at 1326.

The record reflects that the TEXACO CALIFORNIA passed buoy 47 at 1353 hours on September 16, 1985. At buoy 47, the record reflects that the vessel was traveling 8.8 knots but that its minimum steerageway speed was estimated at 2½ to 3 knots. The time of the large wave, or surge, is compatible with the time of the death of Dau Van Tran.

A second expert, placed on the stand by Tran and Pham, a Mr. Roger L. Owens, expressed an opinion based on information he had, plus his research, calculations and on-site inspections. He said the cause of the accident made the basis of this suit was:

"A ... [J]ust excessive speed of a very large loaded vessel transiting the Canal."

Further, Mr. Owens used a definition of gross negligence as being "that entire want of care which would raise the belief that the act or omission complained of was a result of a conscious indifference to the right or welfare of a person or persons to be affected by it", and Owens, reaffirming that he understood the definition, was asked if he had an opinion as to whether or not the TEXACO CALIFORNIA was grossly negligent. His answer was:

"A Yes, because the Master was grossly negligent."

■ Other evidence of probative force exists in the record, which was admissible as opinions and inferences of the experts under *TEX.R.CIV.EVID. 702, 703, 704* and *705.* This was a bench trial where an experienced district judge could properly weigh the testimony of the witnesses and assess the credibility that the testimony merited. A presumption exists that the judge considered only proper evidence.

Upon analysis, and upon applying the accepted standards for appellate review, we overrule the Appellants' first point of error. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); R. Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error", 38 TEXAS L.REV. 361 (1960). Compellingly similar standards govern bench trials.

Appellants' Point of Error No. II is: "There is no evidence of record to support the award of survival damages."

■ An ambulance service received an emergency call at about 1425 hours on September 16, 1985. The ambulance arrived in Sabine Pass at 1447 hours, picked up Dau Van Tran, and left Sabine Pass at 1502 hours and arrived at the hospital in Port Arthur at 1523 hours. There exists a narrative account of the medical assistance that was afforded to Dau Van Tran by the Diamond Emergency Medical Services.

In addition, a witness, who qualified as an expert, named Captain Robert J. Underhill, testified that the MISS MARY was pulled out, fetched back on her lines and then came slamming back in because of the large wave. When the MISS MARY came slamming back in, according to the expert, it slammed Dau Van Tran between its side and the dock barge. This was described as a pretty violent blow to the body of Dau, the violent blow resulting from the excessive speed of the TEXACO CALIFORNIA, and from nothing else, according to Captain Underwood. His testimony was that the young man was still conscious after the incident took place and that Dau had been moaning and uttering groans. Dau was alive when he left the scene of the occurrence and the record reflects that Dau survived for at least 35 to 40 minutes. We conclude that there was sufficient evidence to support the Bench's finding that Dau suffered conscious pain and conscious suffering for about 35 to 40 minutes. The award for this element of damages was not excessive. For example, in *Gulf States Utilities Co. v. Reed,* 659 S.W.2d 849 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.), an award was made in the amount of $10,000. to a mother for the pain and suffering of her son. The pain and suffering had a duration of approximately 5 seconds.

In another, somewhat parallel and persuasive, case, a citizen of the United States of Mexico recovered $175,000. for conscious pain and suffering during an undetermined amount of time. That case is *Levinge Corp. v. Ledezma,* 752 S.W.2d 641 (Tex. App.—Houston [1st Dist.] 1988, no writ). In that situation, the employer's accident report revealed that the time of injury was about 3:05 p.m. The arrival of the injured person at the emergency room occurred about 3:30 p.m., the death occurring at 3:43 p.m. A fellow worker saw the deceased fall from a pickup truck, hit the ground and bounce and jerk. The witness testified that the man's eyes were open and he was coughing and gasping for air and that blood was spurting forth from his mouth in a steady emission. The deceased was trying to expectorate it. The Houston Court of Appeals declined to substitute its own judgment for that of the trier of the facts,

stating that it could only do so if the record clearly indicated that the award was based upon passion, prejudice, improper motive or was so excessive as to actually shock the conscience of the jurists. We do not find these passions and improper motives here. *See and compare K–Mart Apparel Fashions Corp. v. Ramsey,* 695 S.W.2d 243 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

■ Nextly, the Appellants advance that prejudicial error was committed when the trial court sustained the objections of the Appellees to the testimony of the Appellants' designated expert witnesses. The designation by the Appellants of their expert witnesses was made somewhat less than 30 days prior to the start of the trial on the merits.

■ The significant facts are that, on two occasions prior to the late letter adding the Appellants' two experts, Gilbert and Horne, the Appellants had answered "unknown at present" when the Plaintiffs/Appellees attempted to ascertain the identity of all the expert witnesses to be proffered by the Appellants. The Appellants have simply failed to meet their burden of good cause in the sense that they have failed to convince the trial bench that their late designation of the two experts was reasonable. The recent trend of the decisions on the discovery rules is that the imposition of either penalties or sanctions for the failure, delay or refusal of a party to comply with discovery rules rests within the sound discretion of the trial court. The trial court has the burden of seeing to it that the discovery rules are followed after having been clearly mandated by our Supreme Court. The trial court also has the burden, to a great extent, to see that the case is properly prepared for an adequate and truth-seeking trial on the merits. The decisions reached by the district bench, in an attempt to obtain compliance with the discovery rules, cannot be reversed unless the appellate court determines that the trial bench abused its discretion as a matter of law. We simply cannot make such a finding under this record. *Alexander v. Barlow,* 671 S.W.2d 531 (Tex.App.—Houston

[1st Dist.] 1983, writ ref'd n.r.e.); *Jarrett v. Warhola,* 695 S.W.2d 8 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd).

The Appellants' brief next advances that it was error to award damages for past and future mental anguish; and that it was clearly error for the trial court to award prejudgment interest thereon. *See and compare Moore v. Lillebo,* 722 S.W.2d 683 (Tex.1986); *Clifton v. Southern Pacific Transp. Co.,* 709 S.W.2d 636 (Tex.1986).

■ The basic position taken by the Appellants is that the deceased, Dau Van Tran, was a seaman and Dau was injured and met his death on navigable waters and, therefore, the general maritime law should not only control but be the exclusive law applicable. Under the general maritime law, the Appellants argue that any damages for mental pain or mental anguish, or any interest, should be entirely disallowed. However, as a defensive matter, it was never pleaded that Dau was a seaman. The court did not find that Dau was a seaman.

The Appellants' live pleadings was their Original Answer which set up, generally, the defenses of contributory negligence, negligence of third party, assumption of risk and unavoidable accident. It is not shown in the record that Dau was a seaman. The record reflects that he worked for himself and that he was in the nature of a volunteer when attempting to help out an older man who was the Captain of the MISS MARY by retrieving or relieving some sort of an object from around or near the propeller. The record shows that he was not being paid by anyone and that he volunteered to help a much older man, a Mr. Yen Nguyen. There is ample evidence of probative force that, as a result of the large wave and surge, that protruded upon the land 120 feet to 130 feet, or more, the MISS MARY was pulled out, fetched up on her lines and then slammed back in against the dock barge. There is evidence that Dau was against the dock barge between two tires and the slamming back in of MISS MARY was strong enough to squash the two tires and Dau Van Tran as well. Therefore, the actual death-producing trau-

ma or injury was experienced on or at the dock. Such a dock, or barge dock, has been recognized as an extension of the land. From the record, it was shown that death occurred within the State territorial waters.

It is clear, in the present case, that the Appellees sought to obtain a judgment against the Appellants based on the theory of negligence under the Texas Wrongful Death Statute *TEX.CIV.PRAC. & REM. CODE ANN. Secs. 71.001–71.002* (Vernon 1986), and the Texas Survival Statute *TEX. CIV.PRAC. & REM.CODE ANN. Sec. 71.-021* (Vernon 1986). The Appellees did not plead for relief under the doctrine of unseaworthiness. They did not invoke the maritime law.

As the points were presented and argued on appeal, we conclude that the Appellants should have pleaded that Dau Van Tran was a seaman. They should have pleaded facts invoking the general maritime law, or general admiralty law. Appellants' pleadings do not exclude the Texas Wrongful Death Statute nor the Survival Statute. Vis-a-vis the Plaintiffs'/Appellees' live pleadings at the trial bench, TMSI's and TRMI's contentions as to the status of Dau Van Tran was in the nature of an affirmative defense. *TEX.R.CIV.P. 94* required such an affirmative pleading to give fair and reasonable notice to the Plaintiffs below. This, the Appellants failed to do. Indeed, there is documentary evidence in the case that Dau Van Tran was self-employed and simply had no employment relationship to the MISS MARY or the captain thereof. There is really no contention and there is no question but that Dau Van Tran was not a longshoreman. He simply did not fit under the definition of a longshoreman, under the Longshore and Harbor Workers' Compensation Act, *33 U.S.C.A. Sec. 901* et seq. (1986). The tragic death occurred within the city limits of Port Arthur, Jefferson County. There is no application, here, of death on the high seas act, popularly known as "DOHSA", *46 U.S.C. Sec. 761* et seq. The high seas have been authoritatively limited as being more than one league, or about 3 miles, off the shoreline.

■ As early as 1928, the Supreme Court of the United States has held that a stage and a wharf are generally deemed to be an extension of the land. *T. Smith & Son, Inc. v. Taylor*, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928). Importantly, *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), pointed out that a maritime locality, alone, was not sufficient to invoke the exclusive admiralty jurisdiction. Justice Stewart stressed that the main business of the admiralty court involves claims for cargo damage, collisions of vessels, injuries to seamen and the like. The Supreme Court of the United States found serious difficulties with using the locality test only, further pointing out that, for the federal admiralty jurisdiction to come into play, there must be a maritime nexus or connection; that is, some substantial relationship between the tort and traditional maritime activities, such as navigation or commerce on navigable waters. When such a relationship or nexus is absent, the fact that a tort may have occurred upon navigable waters is immaterial to any meaningful and determinative invocation of the jurisdiction of the admiralty courts.

The Fifth Circuit Court of Appeals for the United States, in 1981, decided *Karpovs v. State of Mississippi*, 663 F.2d 640 (5th Cir.1981). Circuit Judge Politz, writing without a dissent, held, at page 648:

"... Maritime jurisdiction does not extend to torts occurring on piers, bridges, jetties, or even ramps or railways running into the sea. *Rodrique v. Aetna Casualty Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969). Any suggested inroads on this long-standing rule ended in 1972, when the Supreme Court held that in addition to a maritime locality, admiralty jurisdiction will not lie unless there is a significant relationship between the tort claim and traditional maritime activity. *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Richardson v. Foremost Insurance Co.*, 641 F.2d 314 (5th Cir.1981).

We simply find no significant relationship between the negligence claim herein and traditional maritime activity.

From the standpoint of parallel reasoning and analagous rationale and an analysis of the clear, congressional purpose, the compelling case is *The Tungus v. Skovgaard,* 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959). In *The Tungus, supra,* the Supreme Court reasoned and held that a policy expressed and enacted by the legislature of a sovereign state in passing a wrongful death statute is not merely that the death shall give rise to the right of recovery, nor that the tortious or negligent conduct resulting in the death shall be actionable; but, just as importantly, the damages provided by the wrongful death statute shall be recoverable when actions or omissions of a particular kind result in a death. Thus, it becomes incumbent upon a court enforcing that legislative policy to enforce it all. The enforcing court may not pick or choose.

The Supreme Court reasoned that congressional enactments, such as the Death on the High Seas Act, clearly manifest that the rights, remedies and damages under the state death statutes (when deaths occur on state territorial waters), were all to be left unimpaired and that the overall intent of the Congress was to preserve; indeed, to insure the state's sovereignty over death actions even though caused by maritime torts occurring with the state's territorial waters. *See Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). In 436 U.S., at page 620, Footnote 9, 98 S.Ct., at page 2012, Footnote 9, 56 L.Ed.2d, at page 584, Footnote 9, it reads:

> "9. Sec. 766. In addition, the statute preserved the applicability of local law on the Great Lakes, in the Panama Canal Zone, and within the States' territorial waters. Sec. 767. Rights under foreign wrongful-death laws were also preserved. Sec. 764."

Justice Oliver W. Holmes, a giant of a jurist, reasoned, in *Old Dominion Steamship Co. v. Gilmore,* 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264 (1907), that Congress had the power to regulate commerce and to legislate upon admiralty and maritime jurisdiction; further, the Congress could extend the judicial power to cases of admiralty and maritime jurisdiction. The Congress had been silent up to a point. Justice Holmes held that the savings to the suitors clause leaves open and in full force the common-law jurisdiction of the States' courts, even over torts committed at sea, and the State courts, in their decisions, could and would follow their own notions about this field of law.

The reasoning and the holdings of *The Tungus, supra,* authorizes and, indeed, requires us to overrule the Appellants' points of error attacking the allowance of damages for mental anguish and damages by way of prejudgment interest, except as to future mental anguish. We conclude no prejudgment interest was awarded on future damages in the judgment. The judgment exceeds one million dollars.

■ We hold that the 60th Judicial District Court of Texas had jurisdiction and full authority to try the case, having jurisdiction and venue of the parties and the subject matter. Because of the locale of the injury and because of the lack of impact on general maritime commerce and navigation, inter alia; we decide that the governing, ultimate facts, as found by the trial bench, do not constitute a maritime tort. But, even if the facts, as found below, constituted a maritime tort, which we deny; nevertheless, the Texas District Court had full jurisdiction pursuant to Texas Wrongful Death Statute and the Texas Survival Statute. *Mobil Oil Corp. v. Higginbotham, supra,* and *Old Dominion Steamship Co. v. Gilmore, supra.*

*28 U.S.C.A. Sec. 1333* (1966) specifically saves to the suitors in all cases all other remedies to which they are otherwise entitled. This saving to the suitors provision applies to any civil case that might otherwise be considered within the admiralty or maritime jurisdiction. Texas has provided other remedies under *TEX.CIV.PRAC. & REM.CODE ANN. Secs. 71.001* and *71.021* (Vernon 1986).

The Appellants' last point of error, VII, avers that the evidence is insufficient to support the findings of negligence and causation and the court's judgment based thereon and, as a subpoint, that the findings and judgment are so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust. We disagree. The above discussion overrules this point.

Appellants attack the trial bench's monetary award for loss of society, companionship and affection. They simply advance the contention that the amount of damages for this loss is excessive and against the great weight and preponderance of the evidence. They cite *Pope v. Moore*, 711 S.W.2d 622 (Tex.1986), placing major reliance on *Pope v. Moore, supra.*

In *Pope, supra,* in a per curiam opinion by the Supreme Court, the court held that factual sufficiency is the sole remittitur standard for actual damages and in deciding whether the damages are excessive. Courts of appeal should employ the same test as for any other factually insufficient question. Courts of appeal must detail the relevant evidence, if any, requiring remittitur and when ordering a remittitur the appeals court shall clearly state why the fact finder's award is so factually insufficient or, on the other hand, so against the great weight and preponderance of the evidence as to be manifestly unjust.

Our court should be aware of the preachments in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986), even in this bench-tried case. Pursuant to *Pope, supra,* and *Pool, supra,* upon an analysis of the evidence on this point, we cannot order a remittitur. The judgment below· is affirmed.

AFFIRMED.