**Helen WATSON and Rix Watson, Appellants,**

**v.**

**Reuben A. ISERN, M.D., Appellee.**

**No. 09–88–210 CV.**

Court of Appeals of Texas, Beaumont.

Dec. 21, 1989.

Rehearing Denied Jan. 24, 1990.

son reported that she had broken her leg, was suffering severe pain and had a sensation similar to that of ants crawling on her leg. She could not move her foot or toes.

The Appellants argue that the testimony of independent medical experts and treating doctors established that she had suffered a ruptured popliteal artery and had suffered severe damage to the stability of the leg. Thus, she should have been admitted for immediate surgery. However, due to a delay of about three days, she suffered massive leg damage due to the lack of blood supply to the leg, resulting in an amputation of a part of her leg below the knee.

Special issue number one was the only issue that was submitted unconditionally. The remaining nine special issues were conditioned on the first issue and were unanswered. Several of the issues had as many as eight subparts.

Appellants seek a reversal and remand based on twelve points of error. The first point is that the trial court abused its discretion and erred in denying Appellant the right to impeach one Dr. Barbee concerning his relationship with defense counsel, the number of suits that defense counsel had handled for him and the malpractice claims against Dr. Barbee. Appellant argued such error was calculated to be prejudicial to her and to deny her state constitutional right to impeach an adverse witness so as to obtain a fair and impartial trial. Dr. James Barbee was called as the defendant's independent expert medical witness. He supported the defendant's testimony that the patient's condition did not reflect a sufficient injury to require her hospitalization. Appellant sought to impeach this medical doctor by showing bias. In considering this point the entirety of the questioning of Dr. Barbee is to be analyzed.

Dr. Barbee testified that he had experience in diagnosing knee injuries, and especially experience in the emergency treatment of knee injuries. He defined the emergency injuries as limb threatening injuries. Dr. Barbee, himself, had experienced personally three dislocated knees. This doctor testified at some length about his own personal knee injuries, describing

John H. Holloway, Houston, for appellants.

Jo Ben Whittenburg, Orgain, Bell & Tucker, Beaumont, for appellee.

## OPINION

BROOKSHIRE, Justice.

This is a medical malpractice case. Mrs. Watson had experienced a fall hitting the back of her right knee across railroad ties, thereby twisting her leg. The record reflects she weighed about 270 pounds at the time. She was immediately taken to the emergency room of a Beaumont hospital where the Appellee, Dr. Isern, saw her. After X–raying her and finding that the leg involved was not broken, but finding that there was some damage to the knee joint area, Dr. Isern discharged Mrs. Watson to return to her home. She was to remain in bed for two or three days, applying ice packs to the knee. Pain medication was prescribed.

The record reflects that the knee cap had turned to the side and acquaintances of Appellant pulled on her leg so that the kneecap popped back into place. Mrs. Wat-

those generally as a twisting injury, a hyperextension injury involving the anterior cruciate ligament, the medial collateral ligament and the medial meniscus of the right knee.

In addition, Dr. Barbee had reviewed the depositions of Dr. Wolma, Dr. Ivey and Dr. Isern. He expressed his opinion based on reasonable medical probability that Mrs. Watson did not have a ruptured popliteal artery at the time she was seen in the emergency room by the Appellee. He further stated that in his opinion she did not have a torn anterior or specifically posterior cruciates. In non-medical terms, she did not have a swinging door leg. Dr. Barbee further testified that if Mrs. Watson had a ruptured popliteal artery when seen in the emergency room, then signs of gangrene would have been evident when she was later seen in Galveston.

Dr. Barbee testified that he had studied the Galveston records and that there was no indication that she was suffering from any gangrene at the time she was seen in Galveston. The cross-examination of Dr. Barbee before the jury was vigorous and piercing. Dr. Barbee conceded that Dr. Wolma was better equipped by both knowledge and skill to diagnose a ruptured popliteal artery than was the Appellee. A careful analysis of the cross-examination shows that at least some of the questions and answers were acrimonious. The cross-examination went something like this:

"Q. So, you're talking about the longest period of time with a ruptured popliteal artery that you could expect to even have any chance of salvaging the leg would be seventy-two (72) hours after that injury.

"A. There have been survival of legs with train severance or even surgical ligation of the popliteal artery and nothing else. I don't know if you realized that. In World War II, they used to just tie an artery off.

"Q. Sure. And, they lost seventy-two percent (72%) of all legs that they tied off.

"A. Correct.

"Q. Meaning that's not a [sic] too good a *surgical procedure by some nut who would tie off the artery, does it?*

"A. Meaning that the *surgeons in World War II didn't have vascular clamps. They weren't nuts. That's your bias.*

"Q. I'm talking about *that's kind of a nutty thing to do is to tie off an artery to the leg, because if you're going to get seventy-two percent (72%) amputation,* they ought to do something else, shouldn't they?

"A. Maybe you should restate your question. I thought your question meant that a leg was for sure, a hundred percent (100%), going to be gone in a day or two (2) if the popliteal artery was injuried [sic]. Isn't that what you said?

"Q. No, Doctor, I—

"A. *Yeah, that's what you said.*

. . . .

"Q. Let's go back to question and answer *and I'll try to accommodate whatever answer you want to give me....*"
(Emphasis added)

Many of Dr. Barbee's answers contain the same tenor. We find further in the record this:

"Q. And, when I said that *some nut might tie off an artery,* I'm talking about anybody under those circumstances, if they could salvage it, *would be more or less a nut to tie it off, wouldn't they?*

"MR. WHITTENBURG: Your Honor, it's improper for him to ask Dr. Barbee what was going on in his mind *when he called those doctors nuts. I don't know why he called them nuts,* but it's improper for him to ask Dr. Barbee why he did it. He did it and we heard it and he shouldn't ask Dr. Barbee about that.

"THE COURT: Sustain the objection."
(Emphasis added)

And further, it seems that the cross-examination in its vigorous give-and-take was personal as to both the doctor and the cross-examiner:

"Q. Well, the Vietnam conflict was over in '67. That's nine (9) or ten (10) years—

"A. '67? You better check your facts.

"Q. Is that right? So, your—you believe that the Korean conflict was going on at the time you were there.

"MR. WHITTENBURG: Your Honor, that's not what he asked him. He asked him about the Vietnam war and now he's changed it to Korean conflict to try to confuse the doctor. We object to it on that ground.

"THE COURT: Be specific with your questions.

"Q. [By Mr. Holloway] Is it your testimony that the Vietnam conflict was going on in '74 to '76 and the veterans were being air-lifted into that facility?

"A. No, sir. The final pull-out of the United States' troops was sometimes, as I recall, in '75, maybe latter '74.

"Q. All I'm saying is that you were seeing veterans who had been injured there.

"A. Yes."

The cross-examination dealt at some length with the medical practices on Iwo Jima and during the Korean war. Also found:

"Q. And, you could cause a palsy, a drop of the foot which could be permanent for the person's life.

"A. You are saying if the shot is given improperly?

"Q. Improperly.

"A. Yes, correct.

"Q. Okay. And, Doctor, I lost my mother and brother in one (1) year within six (6) months—"

Whereupon, an objection was made which was sustained. Appellant's counsel was instructed by the court not to testify about losing members of his own family. Undoubtedly, the cross-examination was cutting, in parts brilliant, searching in parts, somewhat acrimonious, and at times unorthodox.

### The Bill of Exception

The bill of exception presented by Appellants reflects that Mr. Whittenburg, the defense trial lawyer, was also the attorney of record for Dr. Barbee in connection with other litigation involving Dr. Barbee's alleged malpractice. Apparently there were four other such lawsuits. Appellants' bill reflects that one of these four prior alleged medical malpractice claims or suits involved the death of a man from a ruptured spleen following an injury when a crane fell upon him. A second, settled case, involved an alleged failure to remove glass particles from a patient's leg. Another suit involved treatment of a child. We think these cases are dissimilar.

As the bill of exception was presented, we decide that there was no error in excluding the testimony from the jury. Barbee was a witness—not a defendant. Reasoning by analogy, we think that on an issue of whether a person—in this case a medical doctor—was negligent at a certain time and on a certain occasion, is not usually provable or susceptible of proof by other alleged acts of negligence at other times under other circumstances. A habit or custom of either careful or negligent conduct in respect to a particular act in question would apparently have some probative force. But the courts have usually excluded even habit or custom on one or two theories. The first theory is that such habit or custom is really equivalent to character or disposition and is therefore inadmissible in evidence under the rule against the use of character in civil cases; or, secondly, that such habit or custom or such other acts amount to nothing more than an attempt to prove negligence or lack of ordinary care by testimony or proof of particular acts of negligence on other occasions under other circumstances which is likewise disallowed. 2 R. Ray, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL, sec. 1513 (Texas Practice 3rd Ed.1980). If such evidence is not admissible against a party, we perceive the same should not be admissible against an expert witness. On the theory of bias, Barbee was not asked about particular facts or acts. 1 R. Ray, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL, sec. 679 (Texas Practice 3rd Ed.1980).

Perhaps the trial judge should have allowed before the jury the fact that Mr. Whittenburg was representing Dr. Barbee in other cases without specifying the type of case. In view of the entirety of the direct examination and cross-examination of Dr. Barbee, we do not think that the bill

of exception presented error that amounted to such a denial of the rights of the Appellants as was reasonably calculated to cause and probably did cause a rendition of an improper judgment in the case. *TEX.R. APP.P.* 81(b)(1).

■ The record reflects clearly that the Appellants desired to show that Dr. Barbee had been a defendant in four or five other medical malpractice lawsuits. Appellants' brief argues:

> "... The fact that he was a defendant in a number of malpractice suits would have established his probable 'bias or prejudice' against patients suing physicians. The exclusion of this evidence was prejudicial, a denial of equal protection of the law guaranteed by the State Constitution, and was reversible error, requiring this point to be sustained and the case reversed."

We disagree in light of certain Rules of Evidence pointed out above. 2 R. Ray, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL, sec. 1513 (Texas Practice 3rd Ed.1980).

■ Another contention by Appellants is that Dr. Barbee had falsely testified when he stated he had never given expert testimony in any malpractice case. The chronology of events is important. The falsehood was said to have taken place during the taking of Barbee's deposition. Barbee, at the deposition, thought he was being asked if he had ever testified in any other malpractice case strictly as an expert witness. Barbee had, however, testified in a malpractice suit wherein *he was the defendant.* The record reflects that Barbee was confused. This is also the expressed conclusion of the trial judge. The impeachment value, if any, was so slight that if error resulted, it was harmless.

The record reveals that Mr. Whittenburg had called Dr. Barbee and Dr. Barbee had given expert testimony as a witness at the request of either Mr. Whittenburg or the law firm employing Mr. Whittenburg. In fact, the record contains:

> "Q. Did you tell me at that time that you had been requested to be an expert

in this case by Mr. Whittenburg and not by Dr. Isern?

"A. That's correct.

"Q. So, Dr. Isern hasn't asked you to come down here and tell this Jury anything.

"A. That's correct.

"Q. You're being paid for your services by—not by Dr. Isern, are you? You're being paid by Mr. Whittenburg.

"A. By the insurance company."

■ The record reflects that evidence was presented before the jury that clearly revealed that Dr. Barbee had been retained by the Defendant/Appellee's counsel, and that his professional fee was being paid by an insurance carrier. Seen in this light, the excluded bill of exception was inflammatory without demonstrating bias.

■ The scope, extent and duration of cross-examination must rest within the sound discretion of the trial bench. *Harrison v. Texas Employers Ins. Ass'n,* 747 S.W.2d 494 (Tex.App.—Beaumont 1988, writ den'd); *Austin Road Co. v. Ferris,* 492 S.W.2d 64 (Tex.Civ.App.—Fort Worth 1973, writ ref'd n.r.e.). Hence, the trial court's rulings will not be overturned if the rulings were reasonable and not arbitrary. *See Texas Employers Insurance Association v. Garza,* 308 S.W.2d 521 (Tex.Civ. App.—Amarillo 1957, writ ref'd n.r.e.). On this point, viewing the proffered excluded evidence as presented, we find no error.

■ Point of error two contends that the trial court abused its discretion and committed prejudicial error in allowing Dr. Barbee to testify that Dr. Isern treated Barbee's parents and family, that a "Doppler" examination would not have been performed by Barbee and should not have been performed by Isern, that the injury described in the John Sealy Hospital records could not be the same injury existing in x-rays or records at Beaumont on the date of the injury, and that the plaintiff had been injured subsequent to the defendant's examination of Mrs. Watson. The point is clearly multifarious and duplicitous; the point, as such, failed to preserve error, if any, for review. But we will ad-

dress the point. Upon direct examination when Dr. Barbee was asked about the extent of his experience with Dr. Isern, he volunteered that:

"A. ... As a matter of fact *he is the physician that I chose to take care of my mother and my father and my grandmother and my aunt.*

"MR. HOLLOWAY: Your Honor, *I love that, but on the other hand, I have made an appropriate objection.* This is an attempt to utilize this witness in a manner improper under the Rules of Civil Procedure. I have no way to question this man as to *why he would let this guy even touch his mother, his dog or anything else.* And, I move the Court to instruct this Jury to disregard this as—

"THE COURT: I'm not going to—

"MR. HOLLOWAY:—a violation, Your Honor, of his expertise.

"THE COURT: I don't know where Mr. Whittenburg is headed with his questions, but I certainly think this witness can be questioned about his knowledge of Dr. Isern or his relationship or association with him."

■ The question was asked because a prior objection had been made that there was a lack of showing of how much experience and personal knowledge that Barbee had with Isern. That was the background of the question. We simply see no error here. The door had been flung wide open.

■ Concerning the evidence touching upon the lack of the Doppler examination and upon the John Sealy records not reflecting the same injury and further that the plaintiff had been injured subsequent to the defendant's examination, we think this testimony was within the purview of an expert witness' prerogatives. This challenged testimony was admissible. Hence, these were matters for the jury to weigh and determine. *See Texaco Refining & Marketing, Inc. v. Estate of Tran,* 777 S.W.2d 783 (Tex.App.—Beaumont 1989, writs requested). *TEX.R.CIV.EVID. 702, 703.*

The Appellee's defensive contention was that Mrs. Watson had two falls. Mrs. Watson contended that she had one fall. Coun-sel for Appellant conceded that if there were any fact or circumstance that would support the conclusion that Mrs. Watson suffered an injury to her right knee after 1:50 p.m. on May 2nd, then such evidence would be admissible. The defense took the position that the x-rays of the ankle taken at Galveston are not the same as the x-rays of the same ankle taken at the Beaumont Hospital. And Dr. Barbee's testimony was to the effect that something else—another accident and injury—must have happened after the Appellant, Mrs. Watson, left the emergency room in Beaumont. Dr. Barbee interpreted Mrs. Watson's deposition as indicating that there had been more than one fall. Later, in Barbee's testimony, he was referred to the deposition of Mrs. Watson on cross-examination:

"Q. Did you not tell me on deposition, 'If that's the only injury she sustained, then that's when the injury to the artery had to happen'?

"A. That's correct."

The doctor was carefully cross-examined on this point. Further cross-examination of the doctor is:

"Q. And, if he's not telling the truth, then all of these records and everything that you know from the hospital records, from the things that this lady has told the Jury is that she fell in front of a beer joint on a Saturday night, she hit the back of her leg on a railroad tie and she suffered a blunt trauma which led up to the right leg of this poor lady being removed or amputated on the 17th of May.

"A. If that was the only injury and the only fall, then that's when it happened."

. . . .

"Q. I'll read the question to you. Question, page thirty-eight (38): 'Then, we have a medical certainty that this lady suffered a disruption of the knee and a rupture of the popliteal artery at the time of the initial fall.' What did you answer?

"A. I don't see—what line are you on?

"Q. Page thirty-eight (38), the first line.

"A. Absolutely."

*Texas Rules of Civil Evidence*

*TEX.R.CIV.EVID. 702* provides that if scientific, technical or other specialized knowledge will assist the trier of facts to understand the evidence or to determine a fact in issue, then a witness who is qualified as an expert may testify thereto in the form of an opinion or otherwise. *TEX.R. CIV.EVID. 703*, in relevant part, provides that the facts or data upon which an expert bases an opinion or inferences may be those perceived by or known to him at or before the hearing and if the facts or the data are reasonably relied upon by experts in that particular field in forming their opinions or inferences on that subject, then those facts or data, themselves, need not be admissible in evidence.

*Rule 704* permits testimony to be presented before the jury even if it embraces an ultimate issue to be decided by the trier of facts. Considering these Rules of Civil Evidence touching upon opinions and expert testimony and considering further *Rule 705*, we decide Dr. Barbee's testimony was admissible. No error was committed. We overrule Appellants' point of error two. *Texaco Refining & Marketing, Inc. v. Estate of Tran, supra.*

■ Appellants' third point of error states that the Court erred in overruling the plaintiffs' objections to Special Issue No. One. Special Issue Number One and its answer is:

> "Do you find from a preponderance of the evidence that the plaintiff, Helen Watson, had a ruptured popliteal artery at the time she was examined by Dr. Isern?
>
> "ANSWER: 'Yes' or 'No'.
>
> "ANSWER: <u>No</u>."

The plaintiffs' objections and exceptions to Special Issue No. One were that it constitutes a comment on the weight of the evidence, that no evidence of a second fall was presented, that it was unduly prejudicial in that it assumed a disputed fact, and that it denied a separate theory or right of recovery. Appellants especially argue that there was no evidence that the plaintiff suffered her injury on any occasion subsequent to her examination by Dr. Isern.

We decide Special Issue No. One was not a comment and did not assume that the plaintiff had been injured on a second or later occasion and that No. One did not place an undue emphasis on the defense evidence. Appellants also objected that Special Question No. One was an impermissible comment on the weight and sufficiency of the evidence because it would permit improper argument by the defendant that there was evidence of probative force that the popliteal artery injury occurred at a time which was subsequent to the examination of Dr. Isern.

The next objection was that Question One was the submission of a "Van Zandt" issue, the same being prejudicial and denying the plaintiff her constitutional right to a fair and impartial submission of the factual disputes to the jury.

Other important objections were that Special Issue One was a denial of the plaintiffs' rights to a separate theory of recovery to be submitted in accordance with issues directed to other theories of recovery including the failure of Isern to diagnose and treat the severe ligament injuries and the instability of the right knee. Appellants argue Special Question No. One was objectionable because it did not submit the separate injuries that Mrs. Watson sustained by failure to diagnose her injuries to her ligaments; nor did it submit the necessity to have the injury treated further based on the underlying evidence that injuries to both the ligaments, the right knee and to the ruptured popliteal artery all occurred at the same time.

*TEX.R.CIV.P. 277*, in relevant part, provides that the court shall not, in its charge, directly comment on the weight of the evidence or advise the jury of the effect of its answers; but the court's charge shall not be objectionable on the ground that it incidentally constituted a comment on the weight of the evidence or advised the jury of the effect of the answers when the same is properly part of an instruction or definition. We see no comment on the weight of the evidence in Special Question No. One,

nor do we think it advises the jury of the effect of its answers.

Plaintiff, in her live pleadings pleaded a legal duty to diagnose and treat the plaintiff's injuries and pleaded further that the defendant factually and impliedly represented that he was sufficiently trained, knowledgeable, and informed to determine the nature of the plaintiff's injuries and the necessary medical and surgical treatment therefor, that the doctor held himself out as having that degree of knowledge, care, education and skill which would, in turn, be exercised by a reasonable and prudent physician under same or similar circumstances in connection with both the diagnosis and treatment of the injuries suffered by the plaintiff. The pleading does state that the injuries included a rupture of the popliteal artery, but the pleading also includes many other alleged injuries such as dislocation and damage to the structure of the knee joint, the knee area and other injuries to the plaintiff's right leg and body which allegedly required immediate hospitalization and surgery as soon as possible.

The pleading stated that Mrs. Watson suffered an amputation of the right leg at John Sealy Hospital on or about May 18, 1982, as an alleged direct and proximate result of the defendant's negligence in the diagnosis, improper treatment and the evaluation of her injuries. *We conclude, therefore, that other theories of recovery were clearly raised by her live pleadings other than the rupture of a popliteal vein or a popliteal artery.*

Dr. Isern's live pleading did not challenge, by way of special exceptions, the allegations of plaintiff. Upon a review of the record, we find that several of the requested issues that were denied were definitely supported by the pleadings and also raised by the evidence in the case. Plaintiff followed Rule 273 on jury submissions and presented to the court and requested a number of written questions, definitions and instructions. Plaintiff's request for issues were made separate and apart from the plaintiff's objections to the court's charge.

*The Evidence Raising Refused Issues*

In Galveston, at surgery, after the leg was opened and the fasciotomies had been performed on the four compartments, Dr. Ivey was called in. Dr. Ivey was the surgeon who supervised in the hospital procedures for all adult knee problems. The initial operating surgeons in Galveston asked Dr. Ivey to come in and see Appellant in the operating room. The record reflects that he found severe ligamentous injuries. He found instability in her knee. This instability involved ligaments on the outside of the knee. He described these ligaments as cruciate ligaments, both anterior and posterior. This doctor felt that, because of the time delay between her stated time of injury and the time of her vascular repair in Galveston, it was reasonable to expect some damage to the extremity.

Dr. Ivey testified that, in his opinion, there was nothing omitted at Galveston in an effort to save the right leg. He testified that, both during surgery and subsequent to surgery in Galveston, the procedures and treatments were proper. But amputation was necessary. He felt that the instability was due to a vascular problem. His opinion was that if a popliteal artery—one which was transected—needed to be repaired, then the standard usually recognized is that the operation must be performed in approximately six to eight hours after injury.

He cogently and compellingly testified that a standard technique recognized by physicians in 1982 to help or assist in diagnosing, whether a patient had suffered a traumatic injury to the knee area which may have resulted in a ruptured popliteal artery, was a procedure known as an arteriogram. He stated an arteriogram was a definitive procedure. He described the arteriogram. Other standard procedures utilized by competent physicians in 1982, according to Dr. Ivey, were palpation of pulses in the foot and the use of a Doppler instrument.

This Doppler instrument was used to amplify pulse signals within a blood vessel. He felt that a Doppler instrument would be a better mechanism to utilize than the pal-

pation with a physician's hand. He thought the Doppler instrument would be useful to detect pulses in the foot area and also in the back of the knee area because palpation in the back of the knee was difficult because of other structures and certain fatty tissues in that area. He stated the Doppler instrument was noninvasive and nondangerous. The Doppler instrument gives the doctor the sound of the arterial flow. This doctor further testified that if there was any suspicion the patient had sustained an injury to the popliteal artery or severe ligament disruption to her knee and if no arteriogram had been performed and the Doppler instrument had not been used, then it was Dr. Ivey's opinion that a physician would really not know whether there was a ruptured popliteal artery or not. Due to the signs, symptoms and nature of the injury, if a doctor had any such suspicions, then the patient should not be discharged.

*TEX.R.CIV.P. 278* specifically mandates:
"The Court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."

Plaintiffs had timely requested special question No. B. This requested "B" was a broad form question and fairly complies with *Rule 277. See and compare Lemos v. Montez,* 680 S.W.2d 798 (Tex.1984). Requested Special Issue B, which was refused, inquired whether the Appellee, Reuben Isern, had failed to exercise ordinary care in one or more of the therein subparts and whether such failures were a proximate cause of any injury or damage to Mrs. Watson. The first was: the delay in diagnosis and surgical treatment of the vascular injuries and injuries to her right knee area—a broad form question. But *Rule 277* says the trial court "shall" submit broad form questions. *See Lemos v. Montez, supra.* Below Special Issue B are listed six subparts or alternatives. We find that some of these were fairly pleaded and fairly raised by the evidence.

One alternative, B–3, was in failing to use the Doppler instrument. Another, B–1,

was in failing to obtain the services of a specialist in vascular injuries as a consultant physician. The testimony of Dr. Ivey and Dr. Wolma, in our opinion, certainly raises the question of the negligent failure to use the Doppler instrument. Dr. Ivey testified, in substance, that where a possible vascular injury may exist, an arteriogram was considered customary and usual in determining the nature and extent of the injury by persons knowledgeable about that procedure. Vascular surgeons used such a procedure in 1982.

Under the history given by Mrs. Watson, Dr. Wolma testified that it would have been good medical practice to hospitalize the patient for the purpose of obtaining orthopedic or cardiovascular evaluation. Dr. Wolma thought that when a patient sustained an injury having any suggestion of nerve damage or the possibility of vascular damage, that patient should be hospitalized. Dr. Wolma's testimony indicated that surgery was indicated in the Beaumont hospital. The thrust of this doctor's testimony was that if there was a diagnosis made of injury to the popliteal artery, then an arteriogram and exploration of the popliteal artery and repair would be in order. Also, as a rule, under these circumstances with combined injuries, a vascular surgeon and an orthopedist work together inasmuch as both procedures, above named, are carried out at the same time.

The issues, B–2, of an orthopedic examination and evaluation were raised because of the significant ligamentous injury to the knee joint area which was described as severe damage with an unstable knee. Moreover, an eminent professor at the Texas Medical School testified that the classic symptoms of a ruptured popliteal artery would be the loss of pulses that were past the point of injury, a cold foot, and a leg which had impaired ability to move, meaning, in turn, that the muscles had been affected. Another classic symptom would be that the area of the leg past the point of injury had problems with feeling sensations and pain would be present in the affected extremity past the injury. Mrs. Watson stated that she had feelings of pain and

also a sensation or feeling as if ants were crawling on her leg at the time of the Beaumont examination. This physician assumed that the feeling of ants in the presence of her popliteal artery injury was related to impaired feeling or sensation known as paresthesia. Some lay persons may describe this paresthesia as a tingling feeling in the leg. This same professor, a medical doctor, stated that he could extrapolate from the ligament damage that he observed in Galveston at surgery and could opine that the mechanism of her injury was a hyperextension of the knee; that is, a knee bent backwards; and at the same time, the knee went into a bowlegged position tearing the ligaments on the outside of the knee.

Therefore, under these surrounding facts and circumstances, the calling in of consultants—both a vascular surgeon and an orthopedic surgeon—would have been good medical practice. The doctor stated the back of the knee was completely torn in half. He further opined that most ligament sprains can be properly treated by referral to an orthopedic surgeon and that such a referral would be considered good medical practice. As we view the testimony, it definitely raises and would amply sustain the submission to the jury of a question asking if an orthopedic or vascular surgeon should have been called in and engaged as a consultant. Mrs. Watson requested such an issue.

Likewise, we think the issue, B–6, of failing to hospitalize the patient for further observation and further tests was raised for the jury's consideration. Both party litigants are entitled to an adequate and reasonable presentation of all fact issues of liability or defense supported by pleadings and by evidence which are essential to that party's different theories of recovery or defense. *Blanton v. E. & L. Transport Co.*, 146 Tex. 377, 207 S.W.2d 368 (Tex. 1948); *Solgaard v. Texas & N.O.R. Co.*, 229 S.W.2d 777 (Tex.1950).

Under the entirety of this record the raised negligent fact issues, as discussed above, were not various shades or phases of issue No. One. They should have been submitted.

We decide that the above questions are properly dispositive of the case and that they require a reversal of the judgment and remand of the cause of action for new trial. Point of error four is sustained.

### Appellant's Point on Excluding Certain Testimony

▇ No error has been shown in excluding the testimony of Paula Watson and Kay Watson. This was proferred by Appellant. The Appellee submitted certain Interrogatories requesting Appellant to identify each person known to have knowledge concerning the facts alleged in Appellants' petition, giving their names, addresses and telephone numbers. Thereafter, the Appellant did not identify any persons in her Answers to Interrogatories. She did not come forward with the names, addresses and telephone numbers of Paula or Kay. At trial, Mrs. Watson attempted to offer the testimony of these two undisclosed and unidentified witnesses. Since they had not been properly identified in Appellants' Answers to Interrogatories, *the trial court properly excluded their testimony. Rainbo Baking Co. v. Stafford*, 33 Tex.Sup.Ct.J. 32 (Tex. Oct. 4, 1989); *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297 (Tex.1986)

In other crucial points of error the Appellant complains that certain requested, but refused, issues should have been submitted to the jury. These refused issues inquired whether a reasonable emergency room physician, under the same or similar circumstances, would have hospitalized Mrs. Watson, whether the defendant doctor failed to obtain sufficient information about Mrs. Watson's condition in order to make a correct diagnosis which would, in turn, require further evaluation and treatment; whether the defendant doctor failed to use ordinary care in examining and evaluating her inability to walk or to bear weight on her right leg and whether any such failures were negligence and a proximate cause of the injuries to Mrs. Watson. Under this record, we conclude that *Rule 278* required

that a trial court submit these special questions. *Rule 278* mandates that the trial court "shall submit" the questions, instructions and definitions which are raised by the written pleadings and the evidence. Of course, whether the jury would have found for the Appellant is an entirely separate matter.

Nor do we think that the manner in which this case was submitted was correct. *Westinghouse Electric Corp. v. Pierce*, 271 S.W.2d 422 (Tex.1954). The Supreme Court held that defendants have a right to assume that the plaintiff's case, as made by the pleadings and the evidence, is the case and the only case defendants are called upon to defend and to prepare their defenses upon. The live pleadings in this appeal, however, do not restrict themselves to one theory of negligence or one theory of recovery. As set out above, we have concluded that a number of pleaded issues were at least raised by the evidence. Therefore, these issues should have been submitted to the jury. Otherwise, the Appellant could not have had a full and complete jury trial.

REVERSED AND REMANDED.

WALKER, Chief Justice, concurring in result.

Embarrassedly but not silently, I concur in the result. I was the trial judge in this case. This case was given to the jury upon a charge that was then felt to be in conformity with the concept of "streamlining the issues", getting to the heart of the case and eliminating the verbage. It appeared to me that whether Mrs. Watson had a ruptured popliteal artery at the time the defendant examined her was the "gut question", since a ruptured popliteal artery is what caused her ultimate problem. During the heat of battle, my focus became perhaps too narrow and too streamlined, thus eliminating all other legitimate bites at the apple. Thus I erred, thus I reverse myself and close with this soliloquy:

"It's lonesome to stand before Bench and Bar,

without even a leaf to hide thee;

With error disclosed, yet tis better by far

than to allow my pride to control me."