

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00030-CV

———————————————

CHYANNE NICHOLS, Appellant

V.

MARC AARON WILSON, M.D.; ALLIANCE HEALTH PARTNERS, PLLC; AND
ALLIANCE OB/GYN SPECIALISTS, PLLC, Appellees

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-301065-18

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

Appellant Chyanne Nichols[1] appeals from a take-nothing judgment in a medical-malpractice action rendered in favor of Appellees Marc Aaron Wilson, M.D.; Alliance Health Partners, PLLC; and Alliance Ob/Gyn Specialists, PLLC.[2] A jury answered "[n]o" to a charge question that asked whether Appellees' acts were negligent or a proximate cause of Appellant's injuries.

Mrs. Dozier raises two issues on appeal. We will address her second issue—in which she attacks the adverse jury finding on legal- and factual-sufficiency grounds—first. We overrule this issue because the jury heard a battle of medical experts and because the record establishes that there is some evidence supporting the jury's answer and that the answer is not against the great weight and preponderance of the evidence.

We also overrule Mrs. Dozier's first issue that challenges the trial court's refusal to permit her counsel to question one of Dr. Wilson's expert witnesses on a particular topic. Mrs. Dozier contends that it was error to prohibit questioning the expert about whether he was biased because he had been sued by Mrs. Dozier's counsel for

---

[1]We will refer to Appellant as Appellant, Plaintiff, or Mrs. Dozier, which is her married name and the name by which she was referred to during the trial.

[2]With regard to Appellees, we will refer solely to Dr. Wilson as he is the doctor who performed the procedure that is the subject of Mrs. Dozier's claims of negligence; the remaining Appellees are practice groups with which he is affiliated.

allegedly previously committing breaches of the standard of care similar to those that she had alleged against Dr. Wilson. We overrule this issue because Mrs. Dozier never explains how this one alleged error so tainted the record that it probably caused the rendition of an improper judgment, i.e., how—in view of the numerous opinions going both ways—the jury would have changed its answer if it had been privy to the fact that one of Dr. Wilson's experts had previously acted negligently or had injured another patient. Here, the view that this restriction on cross-examination caused the rendition of an improper judgment is even more unlikely because the expert's credibility had already suffered a blow from the cross-examination that resulted when the expert changed his opinion in front of the jury, switching from his conclusion that Dr. Wilson had not met the standard of care to one that he had. Further, the trial court did not abuse its discretion by limiting the scope of cross-examination; to have permitted cross-examination on the expert's alleged prior negligence would have created the real possibility of a lengthy trial within a trial dealing with whether claims against the expert were similar to those alleged against Dr. Wilson and whether the proof that would be offered to establish the existence and similarity of the claims was appropriate. The trial court had the discretion to limit cross-examination of the expert so as to not spend excessive time dealing with a subsidiary issue.

Based on our disposition of these issues, we affirm the trial court's judgment.

## II. Factual and Procedural Background

For six days, the jury heard testimony, including the testimony of twelve medical doctors who offered opinions on whether the care that Mrs. Dozier had received met the required standard of care and when and how her injury had occurred. In the simplest terms, Plaintiff's theory of the case was that Mrs. Dozier's bowel had been perforated during a procedure performed by Dr. Wilson and that the standard of care required a "meticulous inspection and examination of the surgical area" before ending the procedure "to ensure [that the surgeon had not] caused an unintended injury to the surgical anatomy." According to Plaintiff's theory, Dr. Wilson failed to meet this standard of care because he had not examined Mrs. Dozier's bowel before ending the procedure, even though the procedure he conducted involved the bowel.[3]

### A. The medical procedure that is at issue in this appeal

Mrs. Dozier suffers from endometriosis, which is a condition that occurs when "[t]he tissue that normally grows inside the uterus [grows] outside of the uterus." It is a persistent and painful condition. The procedure that is the focus of the instant suit was the third procedure that Mrs. Dozier had undergone to treat her condition.

During the procedure at issue, Mrs. Dozier underwent a fulguration, which is a burning of the uterine tissue growing outside of the uterus. The procedure on

---

[3]The injury occurred to Mrs. Dozier's transverse colon. For simplicity and because the record frequently refers to the injury as having occurred to the bowel, we will use that term when describing the organ involved.

4

Mrs. Dozier was performed laparoscopically. In essence, a laparoscopic procedure involves using an instrument called a trocar to make small incisions in the patient's belly into which instruments are placed. In the procedure at issue, two incisions were made—one in the belly button and the other below that point above the pelvis. As the first step in the process, pneumoperitoneum—the introduction of air or gas into the belly—occurred when carbon dioxide was introduced "in the abdomen to displace the abdomen so that it's away from the intestines."

During the procedure at issue, two sets of instruments were inserted through the incisions. A camera was inserted in one port, and as the procedure was performed, the surgeon watched a screen on which the images from the camera were projected. In this case, the inserted camera took color photographs at various stages of the procedure, and the record contains sixteen color photographs taken at various points throughout. The other port was used for the insertion of two other instruments at different points during the procedure. The first was an endo shear, which was described as a long stick with a little pair of scissors on the end and a cautery device that was used to "burn off" any endometriosis that was found during the procedure. The second instrument was a blunt probe.

During the laparoscopy, the patient's body was positioned according to a "steep Trendelenburg" procedure by which the patient's feet were elevated and the head was lowered. This procedure was intended to displace organs, including the bowel, out of the abdominal cavity.

A central focus of the litigation was the contact of surgical instruments with Mrs. Dozier's bowel during the procedure. As a result of endometriosis and prior procedures, scar tissue may form in the abdomen of a patient. This scar tissue creates adhesions, which in this case were "the [bands of] scar tissue that [were] holding the bowel to the other anatomy." Because of the presence of these adhesions, even though Mrs. Dozier was positioned using the Trendelenburg procedure, her bowel was not completely displaced by the force of gravity. Instead, the adhesions had to be lysed, i.e., cut through. Dr. Wilson described using both the blunt probe and the endo shears to separate the bowel from surrounding tissue to "identify the endometriosis." The focus of Mrs. Dozier's questioning of Dr. Wilson involved whether he had adequately inspected the bowel before ending the surgery when he failed to use a probe to look within the folded structure of the bowel to determine whether an injury to it had occurred during the procedure.

## B. The course of Mrs. Dozier's illness that occurred after the laparoscopic procedure at issue

Another central focus of the trial was Mrs. Dozier's condition and the treatment that she received in the days after the laparoscopic procedure performed by Dr. Wilson. This was a central focus on the question of whether the bowel perforation that was eventually discovered had occurred during the procedure performed by Dr. Wilson or whether it had occurred in the days after the procedure. The basic chronology of events is as follows:

6

**8/24/16**    Dr. Wilson performed the laparoscopic procedure at issue, and Mrs. Dozier was discharged.

**Same day**    One hour and 18 minutes after discharge from the surgery center where the laparoscopic procedure was performed, Mrs. Dozier went to the emergency room of a local hospital and reported pain at a level of nine out of ten and nausea and vomiting. She also reported guarding and rebound tenderness of the area where the surgery occurred.[4] Dr. Wilson was consulted, a sonogram was performed, pain medication was administered, and Mrs. Dozier was sent home without being admitted to the hospital.

**8/26/16**    Mrs. Dozier returned to the emergency room again complaining of severe pain. A CT scan was performed that was read as normal by a radiologist (who was another defendant in this matter due to allegedly misreading the scan). A gynecologist on call for Dr. Wilson was consulted but did not come to the ER. Again, Mrs. Dozier was sent home without being admitted to the hospital.

**8/29/16**    Mrs. Dozier returned to the emergency room. One of the new symptoms that she reported was distension of her abdomen. Mrs. Dozier was admitted to the hospital.

---

[4]The record explains that "abdominal guarding [is] tensing of the abdominal muscles to guard inflamed organs within the abdomen" and that "[r]ebound tenderness is pain [that occurs] after removing pressure from the abdomen when someone presses hands on the abdomen and then quickly removes them."

7

**8/30/16**   In the early morning, another CT scan was performed.  This CT scan was read as "suspicious for developing intra-abdominal abscesses." Dr. Wilson testified that at this point, he consulted with Mrs. Dozier and her mother and told them that he wanted to give the antibiotics that he had administered time to work, but if there were a change, he would operate the next morning.  Dr. Wilson also testified that he decided to operate when Mrs. Dozier's white cell count increased.

**8/31/16**   Dr. Wilson performed surgery and found that there was a perforation in Mrs. Dozier's bowel.  Upon discovery of the perforation, Dr. Wilson called in a general surgeon who had been on standby to repair the bowel.  The surgeon removed the portion of the bowel that was perforated and performed a colostomy.[5]

**Post-8/31/16**   Mrs. Dozier testified that, in the days after the colostomy, her condition continued to worsen.  Mrs. Dozier's mother demanded that she be transferred to another hospital, and she was.  After transfer, another general surgeon undertook the care of Mrs. Dozier.  This surgeon also operated on Mrs. Dozier and reported on the state of the infection that he found and how portions of the wound had pulled apart.  This surgeon also described the

---

[5]As noted in the record, "[C]olostomy surgery is cutting the colon and then reattaching one end to the skin through a hole in the abdomen so it can empty poop into a bag."

ongoing treatment of Mrs. Dozier over the ensuing months and the procedures that she had to endure.

## C.     The effect that the bowel perforation had on Mrs. Dozier's life

At the time of trial, Mrs. Dozier was twenty-five years of age. She testified poignantly about the pain and anxiety that she had endured after the procedure performed by Dr. Wilson and the course of treatment that she had also endured to treat the bowel perforation, including having to wear a colostomy bag. Though she had married and had given birth to a child after the events at issue, she and her husband also testified about the lasting pain and effects on her life that the bowel perforation had caused. For example, Mrs. Dozier's husband testified that her pain often reached a level that she had to be taken to the emergency room. Mrs. Dozier described how the pain she experienced caused her to have panic attacks. She went on to testify that she was no longer able to pursue activities that she had once enjoyed, such as riding horses and racing mini sprint cars. She also described her fear that the physical effects of the bowel perforation would impact her ability to engage in activities with her daughter.

## D.     The clash that occurred at trial over whether Dr. Wilson had met the standard of care when performing the laparoscopic procedure

At the outset of the testimony, Dr. Wilson agreed with Plaintiff's counsel that "the standard of care requires meticulous inspection and examination of the surgical area following fulguration of endometriosis to ensure you haven't caused an

9

unintended injury to the surgical anatomy, including the bowel." Over the ensuing six days of testimony, the jury was presented with a divergence of opinion on whether Dr. Wilson had met this standard. Both sides' experts were presented as highly qualified in their fields and were strenuously cross-examined about their backgrounds, qualifications, prior service as experts on one side of the docket or the other, and the tens of thousands of dollars in fees that they had received for serving as experts in this case.

On Plaintiff's side of the equation, a gynecological surgeon testified in detail about the surgical procedure that Mrs. Dozier had undergone. This expert opined that Dr. Wilson had injured Mrs. Dozier's bowel "[w]ith the combination of lysis of adhesions and the fulguration of endometriosis." He relied heavily on the intraoperative photographs, which were the "colored pictures that Dr. Wilson actually took . . . during his surgery." This expert took the jury through the procedure using the photos. The expert pointed out the anatomy on which Dr. Wilson had performed the procedure and criticized his using only endo shears and not some type of grasper because the endo shears transmitted electricity to cauterize and because using the shears could cause an injury to the tissue touched by the shears. The expert identified areas in the photos where he concluded that the endo shears had caused an injury to the surrounding tissue. The expert also opined that Dr. Wilson had been lysing adhesions in the area where it was later discovered that Mrs. Dozier's bowel was perforated. The expert opined on what Dr. Wilson should have done to meticulously

10

inspect the surgical area and concluded that the matters on which Dr. Wilson had relied (such as a lack of bleeding—referred to as hemostasis—and watching what he was doing as he performed the procedure) were not adequate to meet the standard of care for meticulous inspection.

A general surgeon who operated on Mrs. Dozier after she was transferred to another hospital also presented opinions of the standard of care for a general surgeon. This expert operated under a presumption that "if you have a procedure today and two days or three days from now you have a bowel perforation, until you prove otherwise, it's what happened at the time of the procedure." He further opined that it was the duty of the surgeon to inspect an area where he had been lysing adhesions and to "be certain that there [was] no injury to the bowel." This expert also opined that hemostasis alone constitutes inadequate inspection of the surgical area. In essence, the expert concluded that "if you don't look for it, you won't find it."

A defense expert, whose deposition testimony was introduced by Plaintiff, testified that his "best guess" was that "the injury that caused [Mrs. Dozier's] bowel to perforate was in all probability part of [the laparoscopic] procedure." He also opined on the "standard of care require[d] . . . for intraoperative repair of serosal [the outer layer of the colon] injury if it's identified prior to closure of a procedure" and stated that the "standard of care requires a gynecologic surgeon to meticulously inspect the bowel in the operative field to identify full thickness and serosal injuries prior to closure." This expert, however, did not provide an opinion on whether Dr. Wilson

11

had violated the standard of care when he performed the laparoscopic procedure on Mrs. Dozier.

Marshalled against Plaintiff's experts' opinions and that of the expert quoted in the preceding paragraph were those of Dr. Wilson and the other defense experts. When questioned by his counsel, Dr. Wilson testified that he had met the applicable standard of care, that he was not negligent, and that his care did not proximately cause an injury to Mrs. Dozier. In response to questions from his counsel, Dr. Wilson described the process that he had followed as outlined in his operation report:

Q. Okay. Second page of your operation report, what's my pen pointing to?

A. Trendelenburg position. Steep Trendelenburg.

Q. We discussed that already, correct?

A. Correct.

Q. What's the word it's pointing to?

A. Pneumoperitoneum.

Q. What is that?

A. [$CO_2$] gas in the abdomen.

Q. Okay. You create a pneumoperitoneum when you put in the [$CO_2$] gas?

A. Correct.

Q. You talk about a second port. Would you be kind enough to read that?

A. A second port was then placed in the left upper quadrant.

Q. Okay.

A. Was done on direct visualization.

Q. Where would that be?

A. Up here (indicating).

Q. Okay.

A. Yeah.

Q. Read that sentence, please.

A. The Endo Shears were then used to take down the filmy adhesions and cauterize the endometrial implants noted in the upper gastric region of the abdomen.

Q. Read that.

A. Good hemostasis was noted.

Q. What is hemostasis?

A. Bleeding. There's no -- there's no bleeding whatsoever.

Q. Okay. Now, follow me. I'm going to ask you a question.

A. Okay.

Q. When you are doing the procedure, is -- I asked this earlier -- but is the camera in?

A. Correct.

Q. All right. Every cut with the Endo Shears, is the camera on the cut?

A. Yes.

13

Q. Okay. Every manipulation or takedown with a blunt-forced instrument, is the camera there?

A. Yes.

Q. Okay. So when you -- when you say "good hemostasis," [your] meaning was obtained or the good hemostasis was noted. What does that mean?

A. That means that when I did the procedure and once I took down the adhesions, because of the possibility of bleeding, which is a very common complication associated with this procedure, we wanted to make sure that that was not the case, that she did not have any bleeding after we took down those adhesions.

Q. All right. So if I have a camera pointed on this --

A. Uh-huh.

Q. -- in the abdomen and I'm taking down adhesions along where the lining is at --

A. Right.

Q. -- my camera is pointing at it, and then I create good hemostasis, am I looking at exactly where my cutting or blunt-forced instruments were at?

A. Absolutely.

Q. If you had an injury to the bowel of any sort, would you see it while you're verifying your hemostasis?

A. You would.

Q. Okay. Now, you don't go and say in your report specific words of "I looked for injury to a bowel," you don't say those words, do you?

A. No.

Q. Okay. Why not?

A. Because I didn't have an injury. I wasn't -- when we looked at the adhesions and when we were doing the procedure, I was taking down the adhesions; so the bowel may have been in the vicinity, but it was not in the area that I was operating in.

Q. Okay. Every place that you cut, you've got a camera?

A. Correct.

Q. Every place there's a blunt-forced instrument, you've got a camera?

A. Correct.

Q. Every place you do that, you check for hemostasis?

A. Correct.

Q. And if you see nothing, you know there's no injury there at all?

A. Correct.

Q. To any structure?

A. Right.

Q. Okay. Did you do anything different in Mrs. Dozier's procedure after, whatever it was, 20 years of doing these? Did you do something -- and you never had one -- did you do something different in hers?

A. Absolutely not.

Q. Did you get in a hurry in hers?

A. No.

Q. But even though you never had before?

15

A. No.

Q. Did you exercise less skill and less concern and less observation in hers than you did in any of the other ones for 19 years?

A. Absolutely not.

Q. In reasonable medical probability, can you tell us whether or not you believe there was a bowel perforation at the end of your procedure when you finished?

A. No, there was not.

. . . .

Q. Do the pictures show any evidence of a bowel perforation?

A. No.

Q. In the totality of what you saw through the camera during your procedure, did you ever see any sign or symptom or evidence of a bowel perf at all that was apparent to you?

A. No, absolutely not.

Q. And during your procedure, did you look in the areas where you removed or blunt-forced adhesions, did you look, while doing it, for injury to surrounding structures?

A. Yes.

Q. And did you see it anywhere?

A. No.

Though he had initially agreed with Plaintiff's counsel that Dr. Wilson had not met the standard of care, the defense's first expert on the standard of care stated his opinion that Dr. Wilson had appropriately evaluated Mrs. Dozier before ending the

procedure.[6]  Emphasizing facts similar to those emphasized by Dr. Wilson, this expert

noted that the operative record showed good hemostasis.  The expert then went on to

express why he had concluded that Dr. Wilson had acted within the standard of care:

> Q. From your review of the medical records and your review of Dr. Wilson's sworn deposition testimony, can you tell us whether or not you have an opinion as to whether or not he would have, during the procedure, while lysing adhesions, have been able to see whether or not injuries to the bowel had occurred?
>
> A.  Yes, I have formed an opinion.
>
> Q.  And that is what?
>
> A.  That Dr. Wilson took pictures before he did the surgery and he actually took pictures during the surgery while he was actually cutting, lysing the adhesions, and then he took pictures after the surgery where you could see the adhesions were now gone.  The area that he burned to get rid of the endometriosis fulgurated, cauterized[,] and you could see the bowel in there.  And then he looked for bleeding or no bleeding, and since there was no bleeding, he had to evaluate the area.
>
> So, yes, that's my opinion.

The expert later testified that it was not necessary to look twice at the area where

procedures were performed.  He reiterated that Dr. Wilson had looked because

Dr. Wilson had reported good hemostasis, which indicated that he had looked at the

areas that he had lysed because he could not "evaluate hemostasis without looking at

all of the areas where he [had] lysed adhesions."  The expert also noted that the

general surgeon—who had operated on Mrs. Dozier at the second hospital, who had

---

[6]Whether the trial court erroneously limited the scope of this expert's cross-examination is the subject of Mrs. Dozier's first issue.

17

testified as a Plaintiff's expert, and whose testimony is outlined above—produced an operative report that did not "say anywhere in here that at the conclusion of his lysing of adhesions that he looked all over the bowel and all up and down the bowel for a double look or a second look before he says my hemostasis was good." Instead, that surgeon's notation—"my hemostasis was good"—was the same as Dr. Wilson's.

The defense's second expert who testified on whether Dr. Wilson had met the standard of care stated that Dr. Wilson was not negligent. The second defense expert opined that the operative report prepared by Dr. Wilson with respect to the procedure at issue was excellent. He noted that the report included sixteen photos and described the taking of that many photographs as going above and beyond. The number of photographs indicated that "this is someone [who] cares about what [he is] doing and is taking care during the conduct of the surgery." The second defense expert on the standard of care went on to describe his conclusions as follows:

> [Q.] If a doctor notes in [his] operative report good hemostasis, what does that mean to you?
>
> A. It means that there wasn't bleeding.
>
> Q. If you're looking at where you're lysing and you're taking down adhesions, and you note good hemostasis, is there any way to do that, to note good hemostasis without having looked exactly everywhere you lysed and everywhere you cut adhesion?
>
> A. No. I mean, if you note that, it means you looked.
>
> Q. So when Dr. Wilson's operative report notes good hemostasis was noted, and he notes that before the procedure was completed, as a peer-reviewer at one of the more well thought of institutions in -- I think

18

in the world, does that tell you whether or not Dr. Wilson evaluated and looked at every single place where he lysed or cut an adhesion?

A.   Yeah.   I mean, I would say that, you know, he's -- he described -- he's described the steps of the surgery and what he saw very well, and part of doing surgery is looking at what you're doing and seeing it, and knowing if, in fact, you need to go back and look at something again.

So I'm confident that he's describing that very well, and that good hemostasis was noted and that nothing was seen that looked unusual. And there's more confidence in that opinion because based on the fact that there's 16 pictures.  So I mean, there's a lot here that shows me that the conduct of the case was good.

The defense's second expert on the standard of care stated the same opinion that had been given by the first expert that a "second look" of the surgical area was not required:

Q.  If Dr. Wilson is looking with a camera on the big screen while lysing adhesions, if he's further noting in his op report that he has good hemostasis, meaning there's nothing seen in that area and that he's looking, and if he further has documented bits and pieces of this with 16 pictures, more than what you would have ever seen, do you think Dr. Wilson has met the standard of care?

A.  Yes, I do.

Q.   And do you think that there was anything required by the standard of care for Dr. Wilson, after he had done all of this, to go back and just re-explore the entire abdomen a second time before he closes?

A.  No.

Q.   And, in fact, not only do you say that's not the standard, do you even see reasonable prudent well-trained doctors at your medical institution, when they've done everything that Dr. Wilson did, and we know he did, they don't go back and re-explore for a second look before they close, do they?

19

A. No.

The defense's second expert on the standard of care was subject to a lengthy and dogged cross-examination. The expert agreed that the standard of care required a meticulous inspection of the surgical area before ending the laparoscopic procedure and that "[i]f you lyse adhesions on the bowel, you would inspect it." The expert conceded that he was not aware that Dr. Wilson had lysed on Mrs. Dozier's bowel "prior to coming in here." A continued back-and-forth exchange ensued, with Plaintiff's counsel trying to back the expert away from his opinion that Dr. Wilson had conformed to the standard of care based on Dr. Wilson's statement that he had lysed adhesions on the bowel but not inspected it before ending the procedure and the expert's sticking by his opinion that Dr. Wilson had acted within the standard of care. For example,

> Q. And you've now learned that contrary to what your thought was, that [Dr. Wilson], in fact, did cut adhesions on the transverse colon, but you're still refusing to change your opinion, right?
>
> A. I mean, he -- you know, it's -- you're trying to oversimplify this. I mean, an adhesion -- the adhesion that he was describing that was attached to the transverse colon may have actually been eight or nine inches away from the transverse colon. He may have cut the adhesion at the abdominal wall. The adhesion may have been six inches away.
>
> So, I mean, again, I didn't talk to him about the case or hear about this before, but it's unlikely that the transverse colon was attached to the abdominal wall in this area where he was lysing the adhesions. I mean, the transverse colon lies on the posterior part of the abdominal cavity, and it would be very unlikely that the whole transverse colon was up there and he was cutting right on the transverse colon. That's the anatomy.

20

At another point, the following exchange occurred,

Q. And that's the reason that you can't just rely on looking in one direction while you're cutting to make sure you didn't cause an injury, because you have to go back and inspect and make sure it's not in one of those folds or where the bowel is turned, right?

A. I mean, as I said before and I'll say again, I mean, he was looking at the area that he was lysing adhesions on, and he was doing a meticulous inspection of that area while he was doing it, and that's what you need to do.

Another defense theme relied on literature that reported delayed diagnosis in a large percentage of bowel injuries occurring during laparoscopic surgery. Countering this literature, Plaintiff's counsel noted that the literature included a broad range of procedures and that the types of injuries not found were of a different and more difficult to find type than the injury that was allegedly caused by Dr. Wilson.

**E. The clash that occurred at trial over when and how Mrs. Dozier's bowel perforated**

Another hotly contested issue before the jury was when the perforation in Mrs. Dozier's bowel had occurred. Plaintiff's theory was obviously that the perforation had occurred during the laparoscopy and that the meticulous inspection of the surgical area required by the standard of care would have revealed its presence. The defense's theory was that other forces not caused by the procedure, or which were not apparent during the procedure, caused the perforation and that the perforation did not occur until shortly before its discovery during the follow-up surgery conducted by Dr. Wilson and the general surgeon who was called in to

21

perform the colostomy. A host of disputes arose during which each side tried to support its position and undermine that of its opponent.

The parties clashed as to whether the visits that Mrs. Dozier had to the emergency room on the day of and two days after the laparoscopic procedure suggested the existence of a bowel perforation or were more indicative of normal post-operative complaints. The defense view characterized the symptoms that Mrs. Dozier manifested as not creating a high index of suspicion—i.e., a doctor would not consider a certain diagnosis to be a strong possibility—that a perforation was present. A central feature of this view was that Mrs. Dozier had displayed similar complaints after a prior laparoscopic procedure when no bowel perforation had been present. Indeed, the jury heard from another defense expert who testified as follows:

Q. Between your report and your deposition, do you think we've covered all of your opinions?

A. Not quite.

Q. Okay. What haven't we covered?

A. Well, again, it's my opinion that three different teams evaluated [Mrs. Dozier] from the time that she had her initial surgery to the time that her bowel injury was -- from the time of re-op, let's say that. So there was a seven-day period between the surgery Dr. Wilson performed and the second surgery at which he took part where her bowel was initially repaired. And it's -- it's my opinion that of those three teams -- you know, the first being the two nurses at post-op, the next being that first ER encounter[,] and the third team being the ER encounter 24 hours later, [Mrs. Dozier] was never admitted. So you could say that all three teams missed a bowel perforation. I think that's less likely than the fact that her bowel perforation hadn't happened yet.

22

She had some pretty vague symptoms that are pretty common; she's nauseated, she's hurting.

And then Team 1 sends her home and Team 2 sends her home and Team 3 sends her home, but eventually she gets sick. And in my experience, these patients get very sick. They're febrile, you can just spot them across the room. And working in the ER, I make probably one of these diagnos[e]s every three or four months. I work one day a week as an ER doctor myself GYN ER, so that -- I don't think we dove real deep into that part of things.

Plaintiff's counsel challenged this view by arguing that the conclusions drawn were either simply wrong or had failed to account for subtleties regarding why Mrs. Dozier did not exhibit worrisome symptoms. Plaintiff's counsel cross-examined Dr. Wilson on a number of points, such as whether (1) his action in admitting Mrs. Dozier to the hospital after a prior laparoscopy was consistent with his failure to admit her when she returned to the ER after the procedure at issue, (2) the fact that the differential diagnosis during her second visit to the ER included a suspicion of bowel perforation, (3) Mrs. Dozier's white blood cell count during her second ER visit indicated infection, (4) the fact that Mrs. Dozier did not exhibit all the signs of a bowel perforation in her ER visits before she was admitted to the hospital did not rule out the possibility that she had a perforation based on the symptoms that she did exhibit, and (5) Mrs. Dozier had been constipated during the visits to the ER before her admission. As another example, the defense noted that Mrs. Dozier was not running a temperature; that fact was countered by the fact that Mrs. Dozier was being given medication to reduce her temperature. Other challenges to the contention that

23

her symptoms did not create a high degree of suspicion were whether her abdominal guarding and rebound tenderness were symptoms that should have been viewed as signs of developing peritonitis.

Counterposed to these challenges, a defense expert opined that Mrs. Dozier could not have demonstrated the symptomology that she had on her second visit to the ER if a perforation had been releasing feces into her system for two days before that visit:

> Q. All right. Do you think in reasonable medical probability that Mrs. Dozier could have had a perforation in her bowel on, let's take the 26th of August, and had been spilling poop into her abdomen for two days and gone in and had no fever, no elevated white count, no abdominal distention, that all of these things could have been normal if she had been spilling poop into her abdomen for two days?
>
> A. No, I don't think that that could be possible and/or probable and -- to the best of my medical decision.

The jury also heard testimony about the findings of the CT scan conducted during Mrs. Dozier's second visit to the ER, and the conflicting evidence regarding whether the level of air and fluids or indicators of an abscess in that scan suggested the presence of a perforation. One of the defendants who settled with Mrs. Dozier during trial was the radiologist whom she claimed had misread the CT scan, and Mrs. Dozier presented expert testimony that the findings in the scan were much more dire than the radiologist had reported. But before his dismissal, the radiologist defendant strenuously defended his reading of the scan and his conclusion that the scan did not betray the signs of infection suggesting a perforation.

24

The jury also heard about what was revealed during the surgery on August 31 when the perforation was discovered. Dr. Wilson described the fecal matter discovered during the surgery as "fresh." The general surgeon who performed the colostomy during the August 31 surgery was more explicit in his opinion that the perforation was recent. The surgeon stated this opinion in response to a question asked of him by Dr. Wilson's counsel:

Q. Let me just stop right there for a second.

You said it was fresh -- it was a fresh perforation of the bowel. Upon what did you -- what did you see, what did you observe that tells you that this was a fresh perforation of the bowel, and what time are you talking about?

A. Well, when a bowel perforates and you get spillage of bowel contents into the abdomen, when it's initially there, it's just that, it's just stool that's within the abdominal cavity. It hasn't had time to set up a significant infectious inflammatory process.

When people have had a perforation of their bowel that is partly contained by the normal healing processes in the abdomen, you get the development of a thick, yellowy, infected material, and we didn't see that. We saw just some cloudy fluid, which was the start of an infection. Might have been leftover fluid from the original operation Dr. Wilson did, but we didn't see any signs that there was any several-day history of ongoing infection.

So we saw that stool. The immediate step is to stop that stool from leaking, which we did, and then we cleared all of the stool from the abdominal cavity, cleared it out completely, and then I made the decision that a colostomy would be the best option for her.

In terms of the timing, I'm not sure. That's how we progressed with the operation. Do you mean the timing of -- what I think the timing of the perforation was?

25

Q. Yeah. You said it was a fresh perforation of the bowel and you now explained why, and I -- I don't even know what you're going to say, but what time period do you think this perforation existed?

A. A few hours. Probably at or about the time she would have come back to the emergency room that evening.

The surgeon also supported his position about the age of the perforation and what caused the perforation by the nature of the necrosis—dead tissue—associated with perforation. When challenged that it takes time for necrosis to develop, the surgeon opined that the necrosis indicated that there had been tissue death rather than penetration by an instrument.

The surgeon's conclusions that he gained from seeing the necrosis illustrated another conflict in the testimony about the cause and timing of the perforation. The pathologist who examined the section of bowel removed by the surgeon testified that the necrosis that she saw was possibly inflicted by an instrument:

Q. Then you say sections of the transmural defect show focal bowel necrosis with acute inflammation in keeping with the clinical perforation.

So let's break down a little bit of that. We already talked about the transmural defect being the through-and-through hole from the outside all the way through the inside layer, right?

A. Correct.

Q. And then . . . show focal bowel necrosis, tell us what that is.

A. Focal bowel necrosis means part of the bowel wall is dead.

Q. And that would be from a lack of blood supply being able to get to it?

26

A. You know, many things cause tissue to be dead, but ultimately, that's -- that's the underlying cause.

Q. But you could have that focal bowel necrosis from an instrumental injury, you would still have that focal bowel necrosis; is that right?

A. Yes.

Q. And so, for instance, if there was a surgical instrument that caused that focal transmural defect, those are the types of findings you could have, would be the focal bowel necrosis?

A. Correct.

In the following exchange, Plaintiff's counsel also highlighted that the surgeon's opinion was at odds with that of a pathologist who had reviewed the bowel section:

Q. And when [the pathologist] was asked, "There's nothing in your findings that would indicate that it's not a bowel perforation from an instrument seven days before," what was her answer?

A. She said, "Correct."

Q. And you are in no position to challenge her pathology findings in that regard, right?

A. I believe I am[] because I believe that the tissue necrosis occurred and then later the bowel perforation occurred.

In his redirect of the surgeon, Dr. Wilson's counsel then highlighted other responses from the pathologist by which she acknowledged that she could not state the cause of the injury and could only date it within a reasonable medical probability to be at least a day old.

27

With respect to the timing of the perforation, the jury also heard from a gynecological pathologist presented by the defense who stated his opinion as follows:

Q. Okay. Can you date the bowel injury in this case to be any older than 24 hours?

A. I think, if I want to, based on the . . . pathologist report[ of] Dr. Hopkovitz, and the bowel injury probably was within a day or so.

Q. Okay. Bowel injury probably occurred within a day or so?

A. Uh-huh.

Q. Yes or no?

A. Yes.

Q. Why?

A. Because there is only focal necrosis and acute inflammation mentioned in that area.

Q. All right. Bowel injury, if you aged it, from your perspective and probability, it's within a day or so; and you base that upon the report of focal necrosis and acute inflammation. Did I say that correctly?

A. Correct.

Of course, if Mrs. Dozier's bowel were not perforated during the laparoscopy, the question became what caused it to perforate. This presented the jury with another clash of expert opinions. The defense presented a theory of a spontaneous perforation. Dr. Wilson thought perhaps the wall of the bowel was weakened during the procedure and later perforated. He explained this possibility in response to a question by Plaintiff's counsel:

28

Q. Okay. So you have no evidence there was endometriosis. You have no evidence there was weakening. You have no evidence that this spontaneous perforation happened, you're just guessing that, right?

A. So, no. So, again, when you think about the anatomy and the fact that the bowel is extremely thin, and you have the bowel that's extremely thin attached to the adhesion, this stuff there, so it's not inconceivable to think that once you tease that bowel away that you could get a potential injury to the bowel in that area once you tease it, because the bowel is attached to the adhesion.

So if I'm moving the adhesion down and the bowel is attached there, then that could certainly happen.

Other defense experts echoed similar opinions. For example, the following quote from a deposition was read to the jury:

"Doctor" – [P]laintiff's counsel -- "so how is it you believe the perforation occurred to [Mrs. Dozier's] transverse colon?" That was his question. 22, line 23 by [P]laintiff's counsel. Answer, "I think that -- I think that, you know, something happened. I think that there is some validity to the theory that she had a weakened bowel wall from endometriosis, that somehow lysed adhesions weakened further. I think that's my -- that's my -- that's the theory they would go with, that you know the surgery that was done, the lysis of adhesions and fulguration somehow weakened and already -- what was possibly an already weak bowel wall, and, you know, it caused it to eventually rupture." That's the totality of his answer.

Another defense expert responded to the following question on cross-examination:

[Q.] Now, you have an opinion that what may have happened[] was there was an endometriosis on the transverse colon that spontaneously ruptured sometime after surgery, right?

A. That's my conclusion, yes.

29

Plaintiff's counsel attacked these opinions because of an absence of evidence of endometriosis on Mrs. Dozier's bowel and the fact the medical literature recorded no prior incident of a spontaneous bowel perforation due to endometriosis. Another Plaintiff's expert opined that he could "rule out in reasonable medical probability that there was a spontaneous rupture of endometriosis that caused this [bowel] perforation."

Plaintiff's counsel also noted that the pathologist who examined the section of Mrs. Dozier's bowel that was removed during the August 31 colostomy identified certain types of cells associated with inflammation but did not identify those as the type of cells associated with endometriosis. In turn, this opinion was challenged by the defense pathologist who testified that the first pathologist had not done the necessary testing of the cells to determine whether they were endometrial or not. Based on Mrs. Dozier's clinical history, the defense pathologist testified that the likelihood of endometriosis involvement in her bowel was high.

### F. The jury's verdict that Dr. Wilson's actions were not negligent or a proximate cause of Mrs. Dozier's injuries

The charge's definitions of negligence, ordinary care, and proximate cause were routine:

14. "Negligence," when used with respect to the conduct of [Dr. Wilson,] means failure to use ordinary care, that is, failing to do that which an obstetrician gynecologist of ordinary prudence would have done under the same or similar circumstances or doing that which [an] obstetrician gynecologist of ordinary prudence would not have done under the same or similar circumstances.

30

15. "Ordinary care," when used with respect to the conduct of [Dr. Wilson], means that degree of care that an obstetrician gynecologist of ordinary prudence would use under the same or similar circumstances.

16. "Proximate cause," when used with respect to the conduct of [Dr. Wilson], means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that an obstetrician gynecologist using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom. There may be more than one proximate cause of an injury.

There were no objections to the charge.

The jury answered only one question in the charge:

QUESTION NO. 1:

Did the negligence, if any, of those named below proximately cause the injury in question?

Answer "Yes" or "No" for each of the following:

1. [Dr. Wilson]: <u>No</u>

The trial court signed an amended final judgment that Mrs. Dozier take nothing from Dr. Wilson. Mrs. Dozier filed a "Combined Motion for New Trial and Alternative Motion For Judgment Not Withstanding [sic] the Verdict," which was overruled by operation of law. Mrs. Dozier then filed a notice of appeal.

## III. Analysis

### A. Mrs. Dozier's legal- and factual-sufficiency challenges to the jury's response to Question No. 1 of the charge fail.

Though we have tried to be thorough in our factual background, a summary cannot capture the give and take that occurred in the 1,300 pages of testimony in the reporter's record that chronicled the bout in the trial court. Appellant's brief's second issue predicates its sufficiency analysis on the several punches that Plaintiff's counsel threw during the bout that landed hard. But it fails to acknowledge that the jury sat through the bout and scored the punches of the contestants that were hard hits, glancing blows, or failed to connect at all. In the end, the jury scored the bout in Dr. Wilson's favor. The legal- and factual-sufficiency standards of review do not permit us to rescore the jury's determination, especially since Plaintiff had the handicap of bearing the burden of proof.

### B. Standards of Review

#### 1. We set forth the legal-sufficiency standard of review.

When a party attacks the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof—as Mrs. Dozier does in this appeal—the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Cath. Diocese of El Paso v. Porter*, 622 S.W.3d 824, 834 (Tex. 2021). In reviewing a "matter of law" challenge, we must first examine the record for evidence that supports the finding, while ignoring all evidence to the

contrary. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). If no evidence supports the finding, then we will examine the entire record to determine if the contrary position is established as a matter of law. *Id.* We will sustain the issue only if the contrary position is conclusively established. *Id.* Evidence conclusively establishes a fact when the evidence leaves "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019).

### 2. We set forth the factual-sufficiency standard of review.

When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, that party must show that the adverse finding is against the great weight and preponderance of the evidence. *Francis*, 46 S.W.3d at 242. When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

33

**3.** **We set forth the burden of proof in a medical malpractice suit and how conflicting medical expert testimony creates a battle of the experts that is within the purview of the jury to decide.**

The elements of a medical malpractice suit are simply stated as follows:

A medical malpractice plaintiff bears the burden of proving "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019) (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)). Establishing a breach of a duty requires proof of the applicable standard of care, which is defined as "what a doctor of ordinary prudence in that particular field would or would not have done under the circumstances." *Id.*

*Collins v. Vivanco*, 603 S.W.3d 843, 847 (Tex. App.—El Paso 2020, no pet.).

It is axiomatic that expert testimony is usually necessary to establish the standard of care in a medical malpractice suit. *Carl J. Battaglia, M.D., P.A. v. Alexander*, 177 S.W.3d 893, 899 (Tex. 2005) (stating that "as in most health care liability cases, [the standard of care] must be established by competent expert testimony"); *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex. 1995) (observing that the "standard of care demanded in medical malpractice cases requires skills not ordinarily possessed by lay persons" and "typically requires expert testimony to establish the medical standard of care" (citing *Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex. 1977))). The same is true with respect to evidence of causation—"[i]n medical malpractice cases, expert testimony regarding causation is the norm: 'The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the

34

common knowledge and experience of jurors.'" *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010).

As we have explained, medical malpractice cases often present a "battle of the experts," and it is the jury's role to sort out which expert's testimony it credits:

> In a battle of competing experts, it is the sole obligation of the jury to determine the credibility of the witnesses and to weigh their testimony. *See Welch v. McLean*, [191 S.W.3d 147, 160 (Tex. App.—Fort Worth 2005, no pet.) (op. on reh'g), *disagreed with on other grounds by Phillips v. Bramlett*, 288 S.W.3d 876 (Tex. 2009);] *Warner v. Hurt*, 834 S.W.2d 404, 408–09 (Tex. App.—Houston [14th Dist.] 1992, no writ). It is particularly within the jury's province to weigh opinion evidence and the judgment of experts. *Cruz*[ *v. Paso del Norte Health Found.*], 44 S.W.3d [622,] 647 [(Tex. App.—El Paso 2001, pet. denied)] (citing *Pilkington v. Kornell*, 822 S.W.2d 223, 230 (Tex. App.—Dallas 1991, writ denied)). The jury decides which expert witness to credit. *Id.*

*Morrell v. Finke*, 184 S.W.3d 257, 282 (Tex. App.—Fort Worth 2005, pet. denied); *see also Gunn v. McCoy*, 554 S.W.3d 645, 665 (Tex. 2018) ("Like many medical-malpractice cases, this case involved a battle of the experts. In such cases, jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." (citation omitted)).

In *Morrell*, we also noted the constraints that we operate under when reviewing a record that presents a conflict—such as battling expert opinions—for the jury to resolve:

> When we review evidence, we are not free to reweigh the evidence and set aside a jury verdict merely because we feel a different result is more reasonable. *Pool . . .* , 715 S.W.2d [at] 634 . . . . We may not merely substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. *Cruz*, 44 S.W.3d at 647; *Merckling v.*

*Curtis*, 911 S.W.2d 759, 763 (Tex. App.—Houston [1st Dist.] 1995, writ denied). We cannot sit as a thirteenth juror, and we cannot under any circumstances retry the case. *See Warner*, 834 S.W.2d at 408–09.

184 S.W.3d at 282.

Certainly, there are avenues to challenge whether an expert opinion has probative value. In the context of whether expert testimony supported a plaintiff's verdict, the Texas Supreme Court has held that a conclusory expert opinion will not support the judgment:

> To establish breach of a duty, the plaintiff must establish an applicable standard of care. *See generally Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404–05 (Tex. 2009); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879–80 (Tex. 2001). In a medical malpractice negligence case, the standard of care is what a doctor of ordinary prudence in that particular field would or would not have done under the circumstances. *See James v. Brown*, 637 S.W.2d 914, 918 (Tex. 1982) . . . . "Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. Conclusory testimony cannot support a judgment in a medical malpractice case. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). As such, we must examine the record to determine whether [the patient's surviving spouse] provided non-conclusory expert testimony to support the jury's verdict that [the neurosurgeon] breached a duty owed to [the patient]. *See id.*

*Windrum*, 581 S.W.3d at 768. Here, Mrs. Dozier highlights certain opinions that support her sufficiency arguments but leaves unacknowledged those to the contrary. She does not state that the opinions to the contrary lack probative value. Thus, she offers no reason why the jury could not credit the expert opinions that undermine her view of the record.

36

**C.** **We set forth why we reject Mrs. Dozier's sufficiency challenges.**

**1.** **The concessions by Dr. Wilson that are noted in Appellant's brief fail because they pay no heed to the portions of the record that support the verdict.**

As we noted in the introduction to our analysis of Mrs. Dozier's sufficiency challenge, she emphasizes the punches landed by her counsel, the first of which was Dr. Wilson's concession that "the standard of care requires meticulous inspection and examination of the surgical area following fulguration of endometriosis to ensure you haven't caused an unintended injury to the surgical anatomy, including the bowel" and that he did not go back over Mrs. Dozier's bowel before ending the procedure.

Though Appellant's brief correctly quotes the testimony, the brief simply ignores the various opinions offered by both Dr. Wilson and his experts that what he did by checking for hemostasis and watching what he was doing while performing the procedure via the inserted camera met the standard of care and that under these circumstances, a second look before closing was not required. We have outlined this testimony in our recitation of the factual background.

From a legal-sufficiency standpoint, this is some evidence to support the jury's answer to charge question number one. Thus, Mrs. Dozier does not meet the first step in the legal-sufficiency challenge for an issue upon which she bore the burden of proof.

From a factual-sufficiency standpoint, Mrs. Dozier's argument offers one side's perspective of one skirmish in the battle between the experts that the jury heard. As

we have noted, when faced with such a battle, it is the jury's prerogative to decide whom to believe. The jury's verdict is not against the great weight and preponderance of the evidence.[7]

Appellant's brief is equally circumscribed with its attack that the perforation must have occurred during the laparoscopic procedure. This attack highlights Dr. Wilson's concession that the absence of a high white blood cell count immediately after the surgery did not exclude the possibility that her bowel had been perforated. Of course, highlighting this fact in isolation simply ignores the volume of evidence on the other side of the question, such as whether Mrs. Dozier's symptoms revealed a high index of suspicion of a bowel injury, or the results of the CT scan during her second visit to the ER, or the testimony of the general surgeon who operated with Dr. Wilson that the perforation was recent. These pieces of evidence are some evidence that the perforation did not occur during the laparoscopic procedure and show that there was some evidence to support a finding in that regard. Further, this mix of evidence shows that the record is not so tilted that the jury's conclusion—that the perforation occurred after the procedure—is against the great weight and preponderance of the evidence.

---

[7]The argument also spends much of its time discussing that the perforation of Mrs. Dozier's bowel produced an infection and required her to undergo a colostomy. This was not disputed at trial. But what was highly contested was whether Dr. Wilson's treatment was negligent and proximately caused Mrs. Dozier's injuries.

**2. The isolated portions of other experts' testimony that Appellant's brief cites ignore the full record and cannot sustain a legal- or factual-sufficiency challenge.**

Next, Appellant's brief adopts an approach of citing snippets of testimony from defense experts that are favorable to her case and ignoring the unfavorable portions. Again, this approach does not present a viable legal- or factual-sufficiency challenge.

Appellant's brief cites the first defense expert on the standard of care in performing the laparoscopic procedure who appeared to concede that Dr. Wilson had not inspected Mrs. Dozier's bowel in accordance with the standard of care. Again, the brief accurately quotes the testimony of the expert. But what the brief does not note is how the expert later recanted this opinion.

The following exchange during Plaintiff's counsel's redirect of the defense expert highlighted this change of heart:

> Q. Dr. Dulemba, when I talked to you this morning, you told us and in no uncertain terms that Dr. Wilson [had] breached the standard of care in failing to look at the transverse colon prior to closing, right?
>
> A. Well, that's what I stated, but there were some things that I did leave out, when I realized I hadn't discussed the entire aspect.
>
> Q. And then, Doctor, after we took a break for lunch, and you went and had lunch with the attorneys for Dr. Wilson, who paid you $32,000 to defend your friend, that you called him, Dr. Wilson, you come in here after lunch and now your opinion is he didn't breach the standard of care, right?
>
> A. No, that's incorrect.

39

Q. So your opinion is still that he breached the standard of care?

A. No.

Q. Okay. So you changed your opinion after you had lunch?

A. No, my opinion initially on my -- on the expert opinion and also in my deposition that I gave, he did not breach the standard of care, because he looked at it several times. What -- you have me confused, and I admit, you did, you had me confused this morning when you said that he said that he didn't look and then he said that I -- that you had to look twice. He did. He had pictures. He looked while he was doing it[,] and he took pictures afterwards. I didn't realize it when I said it this morning. I didn't come in and say, hey, I want to change my testimony. But no, if you ask me the question again, I'm going to tell you he did not breach the standard of care.

Appellant's brief both fails to mention this event or to tell us why it presented the jury with anything more than a question of the expert's credibility. To the extent that Appellant's brief argues that the snippet it cites was conclusive evidence of a breach of the standard of care, the quote shows that it was not.[8]

---

[8]Appellant's brief also makes an additional argument based on the expert's testimony: "[Dr.] Dulemba also admitted that there was no evidence of endometriosis on the transverse colon during [Dr.] Wilson's surgery and that there was no evidence of endometriosis there during subsequent surgeries. This testimony entirely undermines his alternate 'theory' that there was endometriosis on the transverse colon that spontaneously ruptured." [Record citations omitted.] The testimony cited is not as certain as it is portrayed in the brief:

Q. Okay. So we can rule that out as well. All right.

Now, you have an opinion that what may have happened, was there was an endometriosis on the transverse colon that spontaneously ruptured sometime after surgery, right?

A. That's my conclusion, yes.

Q. Okay. So let's -- let's put that here. Endo on transverse colon that spontaneously ruptured. So let's talk about some of that. We know that Dr. Wilson didn't identify any endometriosis on the transverse colon during his August 24th surgery, right?

A. Correct.

Q. Okay. And we know that there was no evidence of endometriosis identified on Dr. Wilson's and Dr. Mosier's [the general surgeon called in by Dr. Wilson to perform the colostomy on August 31] surgeries to wash out the infection from the perforation and to put the colostomy in, right?

A. Well, there's so much inflammation during that process of what they dealt with, there's no way you would be able to identify any endometriosis almost anywhere.

Q. Okay. But there's no evidence of endometriosis on the transverse colon surgery, right?

A. Correct.

Q. No endo on transverse colon during [Dr.] Wilson and Dr. Mosier, 8/31 surgery.

Okay. And we know that Dr. Aronoff [the surgeon treating Mrs. Dozier after her transfer to another hospital] did a number of surgeries in the ensuing weeks where he didn't identify any endometriosis on the transverse colon, right?

A. That's correct, but I wouldn't have expected him to be looking for it.

Q. Now, let's get to the important one. Dr. Hopkovitz reviewed pathology of the bowel where the actual perforation was, right?

A. I assume that's the pathologist's name?

Q. Yes, sir. Dr. Hopkovitz was the pathologist at Presby Denton that reviewed the actual bowel and the hole that was there, okay?

A. Yes.

41

Appellant's brief adopts the same narrow-viewed strategy with respect to the defense's second expert on the standard of care involved in performing the laparoscopic procedure. The brief cites one page of the expert's more than 100-page testimony. The cited testimony focuses on the fact that the expert did not know until he testified that Dr. Wilson had lysed adhesions on the bowel. As we have noted, this expert was subject to intense cross-examination because of this concession. But we have also noted the expert's opinion that the procedures that Dr. Wilson followed still met the standard of care. This opinion is encapsulated in a simple answer that we have already quoted: "I mean, as I said before and I'll say again, I mean, he was looking at the area that he was lysing adhesions on, and he was doing a meticulous inspection of that area while he was doing it, and that's what you need to do." Again, a complete view of the record demonstrates that the snippet cited in Appellant's brief does not represent the full extent of the record.

Another example of turning a blind eye to testimony that is contrary to an argument is Appellant's brief's description of the testimony of the pathologist who examined the portion of Mrs. Dozier's bowel that was removed during the colostomy.

---

Q. And she didn't document any endometriosis on the pathology study, right?

A. Correct.

Further, Appellant's brief notes that the expert conceded that a bowel perforation had caused injury to Mrs. Dozier and that there was a need for subsequent surgical procedures. As we have noted, that fact is not what was at issue during trial.

42

The short snippets of testimony referenced in Appellant's brief note that the pathologist found no endometriosis on the bowel and that there was nothing in her findings that was inconsistent with the injury to the bowel being caused by an instrument seven days before the bowel's removal. Of course, this view of the record ignores the defense pathologist's testimony that the pathologist who had examined the bowel did not perform the necessary tests to determine whether the cells on the bowel were endometrial or not. It also ignores that on cross-examination, the pathologist who had examined the bowel stated that she could not state in reasonable medical probability "that the perforation [was] any older than a day old." It further ignores the testimony of the surgeon who performed the initial colostomy that the injury to Mrs. Dozier's bowel was not caused by an instrument.

Appellant's brief ends by highlighting the testimony of the general surgeon who treated Mrs. Dozier after her transfer to another hospital from the one in which the colostomy was performed. The quoted testimony sets forth the doctor's opinions dealing with the standard of care of a general surgeon and states that (1) in a laparoscopic procedure, meticulous inspection of the surgical area requires finding and fixing any bowel perforations that may have been caused; (2) failing to identify the perforation intraoperatively is a breach of the standard of care; and (3) the proximate cause of Mrs. Dozier's bowel perforation was the laparoscopic surgery performed before she was transferred to the doctor's care. We have catalogued the host of opinions concluding that Dr. Wilson's actions during the procedure did

conform to the standard of care. Again, highlighting favorable evidence and ignoring the unfavorable is an attempt to argue that the jury mis-weighed the evidence when it was within its purview to decide which experts to credit and which to not. This approach cannot sustain a legal- or factual-sufficiency challenge.

We overrule Mrs. Dozier's second issue.

### D. We set forth why we reject Mrs. Dozier's claim that the trial court's refusal to permit one area of cross-examination of a defense expert constituted harmful error.

In her first issue, Mrs. Dozier argues that the trial court erred by limiting her cross-examination of one of Dr. Wilson's experts. The cross-examination involved the contention that the expert had been previously sued by the same law firm that represented Mrs. Dozier for an act of malpractice similar to that alleged against Dr. Wilson in causing a perforation and in failing to identify it intraoperatively. Being sued for a similar wrong allegedly gave the witness a bias to protect himself by testifying that Dr. Wilson's actions were not negligent.

We take Mrs. Dozier's issues out of the order that she presents them. We do this because by addressing Mrs. Dozier's sufficiency issue first, we can convey the blizzard of expert opinions that the jury had to sort through to reach its verdict and why Mrs. Dozier's sufficiency challenge offered no grounds for us to second-guess the verdict. The state of the record prompts our second somewhat unorthodox approach of assuming error and addressing whether the trial court's ruling—which

limited the scope of cross-examination—was harmful before addressing whether the trial court's ruling was an abuse of discretion.

Mrs. Dozier offers no harmful-error analysis in her opening brief. Though Dr. Wilson challenges whether any error was harmful in his brief, Mrs. Dozier offers no analysis regarding why it was harmful in her reply, other than stating a conclusion that the error was harmful. Even assuming that the trial court erred, we conclude that error was not harmful. First, Mrs. Dozier never explains how the foreclosed topic of cross-examination would have caused the jury to reweigh its resolution in this intense battle of the experts. Nor does Mrs. Dozier explain how the topic of cross-examination that the trial court did not let her pursue would have so undermined this expert's credibility—after he changed his opinion from one unfavorable to Dr. Wilson to a favorable one—that a different verdict would have resulted. And beyond the question of harm, the trial court did not abuse its discretion by denying the proposed cross-examination topic.

### 1. We set forth the topic upon which Plaintiff's counsel sought to cross-examine the expert.

The trial court granted a motion in limine that restricted the discussion of "inquiry of [Dr. Wilson] or any other physician called as a witness, with respect to any lawsuits or claims as the result of prior or subsequent unrelated incidents." At the end of the testimony of Dr. Dulemba (whom we have described above as Dr. Wilson's first defense expert on the standard of care), Plaintiff's counsel made an

offer of proof "regarding Dr. Dulemba's previous similar -- substantially similar lawsuits." The offer began with the question to Dr. Dulemba regarding whether he "had an incentive in this case in defending Dr. Wilson to give the opinion that it was okay to miss a bowel perforation and not fix it intraoperatively during a laparoscopic endometriosis surgery." The alleged incentive was that at the time that Dr. Dulemba wrote his expert report in the underlying matter, the counsel representing Mrs. Dozier "had a lawsuit, representative client, in a lawsuit against [Dr. Dulemba] for failing to identify a perforation intraoperatively to the bowel on a patient, and the patient resulted in a similar, very similar situation to [Mrs.] Dozier."

In response, Dr. Dulemba vigorously challenged that the evidence in the case against him showed a bowel perforation; that challenge produced a four-page discussion in the reporter's record of what the evidence showed in the suit against Dr. Dulemba and the sources that Plaintiff's counsel had relied on to support the claim. Further, Dr. Wilson challenged the document that Plaintiff's counsel used as the basis to impeach Dr. Dulemba. When the trial court sought to focus the questioning on Dr. Dulemba's incentive to testify as he did on behalf of Dr. Wilson, another three-page discussion ensued regarding whether the facts of the case brought against Dr. Dulemba and whether the allegations made in that suit were similar to those alleged against Dr. Wilson, including whether the procedures were similar and whether the injuries were similar. The trial court denied the request to cross-examine Dr. Dulemba about the suit against him by Mrs. Dozier's counsel.

### 2. We set forth the standard in civil cases for determining whether an error is harmful.

Not every error that occurs during trial warrants reversal; thus, Rule 44.1(a)(1) of the Texas Rules of Appellate Procedure provides that in civil cases, "[n]o judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of . . . probably caused the rendition of an improper judgment." Tex. R. App. P. 44.1(a)(1). Whether an error is harmful or harmless "is based on our understanding that 'a litigant is not entitled to a perfect trial for, indeed, few trials are perfect.'" *Gunn*, 554 S.W.3d at 668 (quoting *Lorusso v. Members Mut. Ins. Co.*, 603 S.W.2d 818, 819 (Tex. 1980)). The determination regarding "whether the error probably caused the rendition of an improper judgment 'necessarily is a judgment call entrusted to the sound discretion and good senses of the reviewing court.'" *Id.* (quoting *McCraw v. Maris*, 828 S.W.2d 756, 759 (Tex. 1992)).

Appellate courts apply a harmful-error analysis in deciding whether limiting the scope of the cross-examination of an expert warrants a case's reversal. *See Watson v. Isern*, 782 S.W.2d 546, 549–50 (Tex. App.—Beaumont 1989, writ denied) (showing that appellate court questioned whether trial court had acted properly in denying cross-examination on defense counsel's representation of expert in malpractice cases filed against expert but concluded that in view of the entirety of the direct examination and cross-examination of the expert, appellate court did not think "that

the bill of exception presented error that amounted to such a denial of the rights of the [a]ppellants as was reasonably calculated to cause and probably did cause a rendition of an improper judgment in the case"); *see also C.H. v. Tex. Dep't of Family & Protective Servs.*, No. 03-19-00900-CV, 2020 WL 2786864, at *3 (Tex. App.—Austin May 28, 2020, no pet.) (mem. op.) ("However, even if a trial court erroneously limits cross-examination, we will not reverse unless the error 'probably caused the rendition of an improper judgment' or 'probably prevented the appellant from properly presenting the case' to this [c]ourt." (quoting Tex. R. App. P. 44.1(a), and citing *Davidson v. Great Nat'l Life Ins. Co.*, 737 S.W.2d 312, 314 (Tex. 1987))); *Chavez Constr., Inc. v. McNeeley*, 177 S.W.3d 593, 602–05 (Tex. App.—Houston [1st Dist.] 2005, pet. granted, judgm't vacated w.r.m.) (holding harmless under Texas Rule of Appellate Procedure 44.1(a) refusal to permit cross-examination on changed deposition answers because jury had heard in general terms that witness had changed his answers); *Stam v. Mack*, 984 S.W.2d 747, 751 (Tex. App.—Texarkana 1999, no pet.) (holding harmless trial court's refusal to permit cross-examination on the topic that defense counsel had previously represented expert in malpractice action because party was able to put the issue of expert's bias before the jury); *Harlow v. Hayes*, 991 S.W.2d 24, 29 (Tex. App.—Amarillo 1998, pet. denied) ("However, even assuming arguendo [that] the trial court erred in excluding [expert's] cross-examination with regard to the standards, the excluded examination would not present an error of sufficient magnitude that it probably caused the rendition of an improper judgment or prevented appellant from

properly presenting her case."); *Am. Cyanamid Co. v. Frankson*, 732 S.W.2d 648, 654–55 (Tex. App.—Corpus Christi–Edinburg 1987, writ ref'd n.r.e.) (stating that "[a] trial court has considerable discretion in permitting cross-examination of a witness to show bias or prejudice" and holding that "in this instance[,] the trial court should have allowed the questioning, because of the great latitude that should be allowed on cross-examination, but its failure to do so was not reversible error in this case").

To show harmful error in the admission or exclusion of evidence, we apply the following standards:

- "[W]e review the entire record." *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g).

- "Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Id.*

- "And, ordinarily, this [c]ourt will not reverse a judgment because a trial court erroneously excluded evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case." *Id.*

- "If erroneously[ ]admitted or []excluded evidence was crucial to a key issue, then the error was likely harmful, but not conclusively or per se harmful." *In re A.P.*, No. 02-22-00180-CV, 2022 WL 16646478, at *14

(Tex. App.—Fort Worth Nov. 3, 2022, no pet.) (mem. op.) (citing *Gunn*, 554 S.W.3d at 668).

- But "'likely' does not mean 'definitively,'" and "we apply the same standard—whether the erroneous exclusion of evidence probably caused the rendition of an improper judgment—even when the excluded evidence related to a key issue." *Id.* at 668–69, 671; *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015).

> **3.    We explain why we conclude that any error in prohibiting Plaintiff's counsel from cross-examining the expert about the lawsuit brought against him was not harmful error.**

Here, addressing whether harmful error occurred by the trial court's actions in restricting the expert's cross-examination, Dr. Wilson notes the mix of testimony heard by the jury—a mix that we have highlighted in our discussion of Mrs. Dozier's sufficiency issue and in the factual background:

> Moreover, in no way could exclusion of this amount to harmful error. [Dr.] Dulemba was hardly the only defense witness. And, as to timing of the perforation (the issue about which Appellant sought to impeach [Dr.] Dulemba), not only did [three other experts] testify to similar timing, even . . . [P]laintiff's expert pathologist . . . was unable to time the perforation as any older than a day prior to [the] August 31 surgery, a week after Dr. Wilson's laparoscopic procedure. [Dr.] Dulemba was also not the only standard[-]of[-]care defense expert. Dr. Wilson himself and [another defense expert] are described above. [Record reference omitted.]

Appellant's reply brief does not mention the harmful-error standard of Rule 44.1(a) nor pay much more than lip service to the question in Dr. Wilson's brief regarding

whether the error raised was harmful. The reply brief states, "Because the bias of this expert was necessarily material, *it defies logic to assert as* [*Dr.* ]*Wilson does that the exclusion of this evidence did not affect the jury's verdict.* To vindicate these universal and unquestionable principles, this [c]ourt should reverse the judgment in this case." [Emphasis added.]

The reply brief never explains how Dr. Wilson's harmful-error analysis defies logic. In essence, Mrs. Dozier seeks to retry a case that lasted eight days because of a single error in restricting the scope of one expert's cross-examination. And in doing so she does not even try to answer two pivotal questions regarding harm—one general to the overall record and one specific to the expert in question.

Generally, in light of the raft of opinions regarding whether Dr. Wilson's actions conformed to the standard of care and whether the perforation occurred during the laparoscopic procedure performed by Dr. Wilson, how can we conclude that the limitation on cross-examination probably caused the rendition of an improper judgment? In other words, what logical force is there to the argument that if the jury had only heard that one of the experts who opined favorably to Dr. Wilson had also been sued for acts similar to that of Dr. Wilson, the jury would have been swayed by that fact alone to rebalance its view of all the other opinions it heard and reach a different verdict?

And that possibility—that hearing of the suit against Dr. Dulemba, the jury here would have turned its disposition of the case upside down—is even more remote in this case. The specific question that is not answered in Appellant's brief and in her

reply brief is how the jury's view of the evidence would have been completely upended by the excluded information when Dr. Dulemba's credibility had already been subject to strenuous attack. Dr. Dulemba is the expert who, as we referenced in our sufficiency analysis, initially testified that Dr. Wilson had failed to examine Mrs. Dozier's bowel in accordance with the standard of care before ending the procedure and then returned after lunch to give the opposite opinion. As we have noted, this seeming about-face produced a cross-examination regarding whether the doctor had changed his testimony in essence because of being coached by Dr. Wilson's lawyers at lunch, because he was a friend of the doctor, and because of the tens of thousands of dollars he had been paid in expert-witness fees. Thus, to find harmful error, we must conclude that in light of the various opinions heard in this hotly contested battle of the experts and the blows that Dr. Dulemba's credibility had already suffered, the inability to cross-examine Dr. Dulemba on the excluded topic probably caused the rendition of an improper judgment, i.e., the jury would have answered the first question of the charge differently to find that Dr. Wilson was negligent and that his actions were a proximate cause of Mrs. Dozier's injuries. Under the circumstances we have outlined, we cannot conclude that the trial court's challenged action was harmful.

### 4. The trial court did not abuse its discretion by restricting the scope of Dr. Dulemba's cross-examination.

At the end of Plaintiff's case, the trial court was faced with a claim that an expert had been sued for similar acts of negligence as Dr. Wilson and that this fact showed a bias that caused him to shade his expert report. In response, the expert strenuously denied that the claims against him were similar to those alleged against Dr. Wilson. The record in the offer of proof showed that permitting this issue to be raised in front of the jury could well have prompted a round robin of Plaintiff's counsel raising the issue, the expert defending himself by claiming that the claim was dissimilar and invalid, and Dr. Wilson's counsel challenging the proof that Plaintiff's counsel relied on to establish the allegedly similar occurrence. Further, the trial court had—as had the jury—witnessed the challenges made to Dr. Dulemba's credibility when he was accused of changing his opinion in midstream. The trial court had the discretion and, in this case, did not abuse its discretion by denying cross-examination on this topic to avoid a time-consuming trial within a trial of the claim against Dr. Dulemba.

A trial court has considerable control over the scope of cross-examination; the parameters of that control are described as follows:

> "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tex. R. Evid. 611(b). The trial court has reasonable control over the mode and order of interrogating witnesses and presenting evidence. [Tex. R. Evid.] 611(a). Considerations include the effective ascertainment of the truth, avoiding needless consumption of time, and protecting witnesses from harassment or undue

embarrassment. *Id.* A trial court abuses its discretion if it unduly restricts cross-examination regarding a key issue in the case. *In re Commitment of Campbell*, No. 09-11-00407-CV, 2012 WL 2451620, at *6 (Tex. App.—Beaumont June 28, 2012, pet. denied) (mem. op.).

*In re Commitment of Smith*, 422 S.W.3d 802, 809 (Tex. App.—Beaumont 2014, pet. denied). Thus, we must decide whether the trial court abused its discretion—whether it acted "with disregard of guiding rules or principles or [acted] in an arbitrary or unreasonable manner"—by not permitting the cross-examination of Dr. Dulemba sought by Appellant's counsel. *In re Acad., Ltd.*, 625 S.W.3d 19, 25 (Tex. 2021) (orig. proceeding) (stating standard for abuse of discretion).

Indisputably, a witness may be cross-examined "on any relevant matter, including credibility." Tex. R. Evid. 611(b). It is also indisputable that an appropriate topic of cross-examination for an expert witness is bias. *See, e.g.*, *In re Plains Mktg., L.P.*, 195 S.W.3d 780, 782 (Tex. App.—Beaumont 2006, orig. proceeding) (per curiam) ("To establish bias or prejudice, 'an expert medical witness may be cross-examined regarding the number of times he has testified in lawsuits, payments for such testifying and related questions.' . . . Furthermore, '[p]roof of bias may be offered to impeach the credibility of a witness.'" (first quoting *In re Weir*, 166 S.W.3d 861, 864 (Tex. App.—Beaumont 2005, orig. proceeding) (per curiam); and then citing Tex. R. Evid. 613(b))).

Here, the alleged bias-producing event was a prior lawsuit filed by Mrs. Dozier's counsel against Dr. Dulemba for perforating a bowel while performing

a surgical procedure. Courts generally question the admissibility of impeachment by allegations that a party may have been negligent on another occasion, and the Beaumont Court of Appeals applied that rule to an attempt to impeach an expert witness with the claim that he had been sued for malpractice:

> As the bill of exception [on the other suits against the expert] was presented, we decide that there was no error in excluding the testimony from the jury. [The doctor] was a witness—not a defendant. Reasoning by analogy, we think that on an issue of whether a person—in this case a medical doctor—was negligent at a certain time and on a certain occasion, is not usually provable or susceptible of proof by other alleged acts of negligence at other times under other circumstances. A habit or custom of either careful or negligent conduct in respect to a particular act in question would apparently have some probative force. But the courts have usually excluded even habit or custom on one or two theories. The first theory is that such habit or custom is really equivalent to character or disposition and is therefore inadmissible in evidence under the rule against the use of character in civil cases; or, secondly, that such habit or custom or such other acts amount to nothing more than an attempt to prove negligence or lack of ordinary care by testimony or proof of particular acts of negligence on other occasions under other circumstances which is likewise disallowed. . . . If such evidence is not admissible against a party, we perceive the same should not be admissible against an expert witness. On the theory of bias, [the doctor] was not asked about particular facts or acts.

*Watson*, 782 S.W.2d at 549.

In a different context, the Amarillo Court of Appeals noted that opening the door to whether a defendant was negligent on a different occasion may raise a host of satellite evidentiary issues on whether the other events were similar. In determining whether it was error to deny rebuttal evidence that challenged a defendant doctor's opinions with proof of prior malpractice suits, the Amarillo court explained,

> [T]o the extent that evidence of similar wrongs may be admissible, despite Rule 404(b), it is clear that, at the very least, the circumstances of the incidents and conditions under which they occurred must be reasonably similar. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d [131,] 138 [(Tex. 2004)] (involving unintended acceleration of a vehicle); *Farr v. Wright*, 833 S.W.2d 597, 601 (Tex. App.—Corpus Christi[–Edinburg] 1992, writ denied) (involving a malpractice claim). And, the degree of similarity required depends upon the fact or issue in dispute. *Nissan Motor Co. . . .* , 145 S.W.3d at 138. Yet, even if similar, the evidence remains subject to exclusion if it creates undue prejudice, confusion, or delay. *Id.*

*McKee v. McNeir*, 151 S.W.3d 268, 270 (Tex. App.—Amarillo 2004, no pet.).

The Amarillo court also noted that allegations of similar acts of negligence may spark issues such as whether there is proof that the other event actually occurred:

> Additionally, inherent in both *Nissan* and *Farr* is the requirement that the proponent of the evidence illustrate that the supposedly similar incident actually occurred. Simply put, if the incident did not happen, then it could hardly be admissible to prove the occurrence of some other act or event. And, therein lies the problem here. The only evidence of record purporting to illustrate the existence of the extraneous incidents of malpractice were copies of pleadings and final orders issued by various courts. Yet, most anything can be said in a pleading, whether true or not. Consequently, including an allegation favorable to the pleader in such a document is seldom evidence of its occurrence. *See In re [Marriage of] M.C.*, 65 S.W.3d 188, 193 (Tex. App.—Amarillo 2001, no pet.) (stating that "generally, pleadings are not admissible as proof of their contents in favor of the pleader").

*Id.*

And the Rules of Evidence give a witness the right to defend against a charge of bias. Specifically, Texas Rule of Evidence 613(b)(1) requires that "[w]hen examining a witness about the witness's bias or interest, a party must first tell the witness the circumstances or statements that tend to show the witness's bias or

interest." Tex. R. Evid. 613(b)(1). Rule of Evidence 613(b)(3) then provides that a witness charged with bias may offer a defense to that charge: "A witness must be given the opportunity to explain or deny the circumstances or statements that tend to show the witness's bias or interest. And the witness's proponent may present evidence to rebut the charge of bias or interest." Tex. R. Evid. 613(b)(3).

Here, after days of testimony, the trial court was confronted with a situation regarding whether it would open the door to cross-examination on whether Dr. Dulemba had committed a similar wrong to that alleged against Dr. Wilson—an act that Dr. Dulemba vehemently denied that he had committed. Though Plaintiff's counsel had filed suit alleging a similar act of negligence against Dr. Dulemba, it was apparent that Dr. Dulemba would claim that there had been no perforation in that suit. And in the offer of proof itself, Dr. Wilson's counsel was already challenging the basis for the claim by attacking whether Plaintiff's counsel was relying on the allegations of an expert report or an actual pathology report showing that there had been a bowel perforation. If, as the Amarillo court states, pleadings are not sufficient to establish that a similar act occurred and Dr. Dulemba has the right to defend himself under Rule 613(b)(3), then the trial court was faced with a situation in which, if it permitted the cross-examination, it would have to let Dr. Wilson's jury decide whether there was a bowel perforation in Dr. Dulemba's case. Further, the trial court was already well aware of the intense cross-examination to which Dr. Dulemba had already been subjected when he appeared to change his opinion on whether

Dr. Wilson had met the standard of care. As we have noted, a trial court may restrict cross-examination for various reasons, including to prevent the excessive consumption of time. *Commitment of Smith*, 422 S.W.3d at 809. Faced with the situation below, the trial court acted within the bounds of its discretion in avoiding the sideshow that would have resulted if it had permitted an attack on the credibility of an expert whose credibility had already been strenuously attacked.

We conclude that the trial court's actions in limiting the scope of Dr. Dulemba's cross-examination was neither harmful error nor an abuse of discretion. Accordingly, we overrule Mrs. Dozier's first issue.

## IV. Conclusion

Having overruled Mrs. Dozier's two issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: March 2, 2023